83 F.Supp.2d 135 (1999)
Hon. John H. McBRYDE, Plaintiff,
v.
COMMITTEE TO REVIEW CIRCUIT COUNCIL CONDUCT AND DISABILITY ORDERS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES, Hon. William J. Bauer, the Judicial Council of the Fifth Judicial Circuit, Hon. Henry A. Politz, Defendants,
and
The United States of America, Intervenor-Defendant.
No. CIV.A.98-2457 CKK.
United States District Court, District of Columbia.
December 30, 1999.
*136 *137 *138 *139 Arnon D. Siegel, Washington, D.C., R. David Broiles, Fort Worth, TX, for Plaintiff.
Robert B. Fiske, Jr., Gordon Harriss, Arthur Burke, Davis, Polk & Wardwell, New York, NY, Dennis G. Linder, Thomas W. Millet, Theodore C. Hirt, Craig M. Blackwell, Department of Justice, Washington, D.C., for Defendant.

MEMORANDUM OPINION
KOLLAR-KOTELLY, District Judge.
This case arises out of an investigation by a Special Committee ("Special Committee") of the Judicial Council of the Fifth Judicial Circuit ("Judicial Council") into the conduct of the Honorable John H. McBryde, United States District Judge for the Northern District of Texas, pursuant to the Judicial Conduct and Disability Act of 1980, 28 U.S.C. § 372(c). The Special Committee's investigation spanned two years, culminating in a 159-page Report containing findings of fact and recommendations to the Judicial Council. On December 31, 1997, upon consideration of the Special Committee's Report and various responses thereto, the Judicial Council publicly reprimanded Judge McBryde for "conduct prejudicial to the effective administration of the business of the courts." As a remedial measure, the Judicial Council ordered that no new cases be assigned to Judge McBryde for a period of one year, and disqualified Judge McBryde from participating in any cases involving certain attorneys for a period of three years. Although the disqualification order took effect immediately, the assignment order was stayed while Judge McBryde sought review from the Judicial Conference of the United States. On September 18, 1998, the Committee to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States ("Review Committee") substantially affirmed the Judicial Council's Order. Upon this affirmance, the assignment order took effect immediately, subject to the Review Committee's proviso that it could be lifted if the Judicial Council found that "Judge McBryde's conduct indicates that he has seized the opportunity for self-appraisal and deep reflection in good faith and that he has made substantial progress toward improving his conduct."
In an eight-count complaint filed on October 15, 1998, Judge McBryde challenges the constitutionality of the Act, both facially and as applied to him, on the grounds that the Act violates the separation of powers doctrine (Counts I, II and III), fails to afford due process (Count VI), and violates the First Amendment (Count VIII). In addition, Judge McBryde claims that the proceedings violated the Act and the Fifth Circuit Complaint Rules (Counts IV, V and VII). Judge McBryde names as defendants the Judicial Council of the Fifth Judicial Circuit and its Chairman, the Honorable Henry A. Politz; and the Committee to Review Circuit Conduct and Disability Orders of the Judicial Conference of the United States ("Judicial Conference") and its Chairman, the Honorable William J. Bauer ("Defendants"). This court granted permission for the United States to intervene as a defendant for the limited purpose of defending the constitutionality of the Act.
Before the Court are cross-motions for summary judgment and/or to dismiss filed by Judge McBryde, the Defendants, and the United States. For the reasons elaborated below, the Court finds that the Act is constitutional, both on its face and as it has been applied to Judge McBryde, except insofar as its confidentiality clause impermissibly inhibits Judge McBryde's ability to speak openly about the proceedings. In particular, the Court finds that the Act *140 does not usurp or encroach upon the power of impeachment that properly resides with the Legislative Branch. Nor does the Act jeopardize the independence of the judiciary, an invaluable facet of our democracy that stands to be enhanced by judicial self-monitoring. Moreover, because the Act authorizes review not of the merits of a judge's legal decisions, but of a judge's alarming or destructive pattern of conduct, it poses no threat to a federal judge's Article III function.
In response to Defendants' contention that the Act's finality clause bars review of Judge McBryde's claims, the Court determines that it retains jurisdiction to consider these claims to the extent they allege facial violations of the statute or violations of Judge McBryde's constitutional rights, whether facial or as-applied. Thus authorized to conduct such a review, the Court concludes that no facial violations of the statute took place, with respect either to the scope of the investigation or to the nature of the material which the Special Committee and the Judicial Council addressed. After evaluating carefully Judge McBryde's assertion that Defendants impermissibly reviewed the merits of his judicial decisions, the Court finds that they confined their investigation to a pattern of behavior toward attorneys and others, which they found demonstrates intemperance and abusiveness. Further, the Court concludes that the sanctions levied against Judge McBryde did not transgress into the forbidden realm of impeachment, but rather were limited in scope and tailored to the problem that his behavior posed. The Court finds against Judge McBryde on his due process claims, since Defendants provided him with the fundamental requirements of due process, including notice and an opportunity to be heard.
The Court is, however, persuaded by Judge McBryde's contention that the Act's confidentiality clause, as it has been applied to him, operates as an impermissible prior restraint on his speech. Now that the proceedings have concluded and the sanctions against him have been imposed, Judge McBryde must enjoy the opportunity to speak openly and freely about those proceedings, absent some sufficiently compelling interest to justify curtailment of this opportunity. Defendants have demonstrated no interest of that magnitude here.

I. BACKGROUND[1]
The Judicial Council's investigation and subsequent discipline of Judge McBryde represents the most significant application of the Judicial Conduct and Disability Act, 28 U.S.C. § 372, since its enactment in 1980. Congress designed the Act to provide a mechanism whereby the Judicial Branch can systematically investigate and resolve allegations of judicial misconduct or disability. See S.Rep. No. 96-362, at 1, reprinted in 1980 U.S.C.C.A.N. 4315, 4315. In an effort to address "the growing public demand for the accountability of public officials," id. at 5, members of Congress and the Judicial Branch worked together to draft legislation that would provide an alternative means of remedying conduct that is prejudicial to the administration of justice, and yet does not rise to the level of an impeachable offense, criminal infraction, or reversible error. See H. Rep. No. 101-512, at 10, reprinted in 1990 U.S.C.C.A.N. 6879, 6884 (detailing the involvement of the judiciary in drafting the Act). The conduct targeted by the Act ranges from such intangibles as a lack of "judicial temperament" to patterns of abusive behavior that threaten to undermine the integrity of the judiciary as a whole, as well as behavior symptomatic of an underlying disability. While recognizing that cases of judicial misconduct were infrequent, Congress found that these "[r]are instances of judicial misconduct that have gone unchecked prompt the establishment of a procedure within the judiciary for the processing of complaints aimed at a federal judge." S.Rep. No. 96-362, at 5. The *141 ultimate question before the Court is whether these procedures violate the Constitution, both on their face and as they were applied to Judge McBryde.

A. The Statutory Scheme
In this section, the Court shall present a brief overview of those statutory provisions at issue in this litigation. Section 372(c)(1) permits any person alleging that a district judge "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" to file a written complaint with the chief judge of the circuit. 28 U.S.C. § 372(c)(1). In the alternative, § 372(c)(1) allows the chief judge to "identify" a complaint on the basis of information available to him or her. Id. Upon expeditious review of a complaint, the chief judge has three options: he may dismiss the complaint, see id. § 372(c)(3)(A); conclude the proceeding, see id. § 372(c)(3)(B); or initiate an investigation by appointing a special committee, see id. § 372(c)(4)(A).
If the chief judge decides to appoint a special committee to investigate the charge, the committee "shall conduct an investigation as extensive as it considers necessary, and shall expeditiously file a comprehensive written report thereon with the judicial council of the circuit." Id. § 372(c)(5). After the special committee files its report, the Act empowers the judicial council to respond in a number of ways. If it appears necessary, the judicial council may conduct an additional investigation pursuant to § 372(c)(6)(A). Alternatively, the judicial council may dismiss the complaint pursuant to § 372(c)(6)(C). If the judicial council decides to act on the special committee's report, the Act directs that the judicial council
shall take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit, including, but not limited to, any of the following actions:
...
(iv) ordering that, on a temporary basis for a time certain, no further cases be assigned to any judge or magistrate whose conduct is the subject of a complaint;
...
(vi) censuring or reprimanding such judge or magistrate by means of public announcement; or
(vii) ordering such other action as it considers appropriate under the circumstances.
Id. § 372(c)(6)(B). Although a complainant or judge aggrieved by the judicial council's action may petition the Judicial Conference of the United States for review, in all other respects, any orders and determinations "shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." Id. § 372(c)(10).
Judge McBryde has also challenged the Act's confidentiality clause, id. § 372(c)(14), which renders confidential "all papers, documents, and records of proceedings related to investigations conducted under this subsection." These materials "shall not be disclosed by any person in any proceeding," unless "such disclosure is authorized in writing by the judge ... who is the subject of the complaint and by the chief judge of the circuit, the Chief Justice, or the chairman of the standing committee ...." Id. § 372(c)(14)(C). The confidentiality clause features certain other exceptions, but § 372(c)(14)(C) is the only one that is at issue here.

B. The Special Committee's Investigation and Report
Judge McBryde's difficulties with his colleagues on the Fifth Circuit date back to the spring of 1995, when Chief Judge Jerry Buchmeyer of the Northern District of Texas transferred two cases from Judge McBryde's docket to his own. See In re McBryde, 117 F.3d 208 (5th Cir.1997) ("McBryde I") (providing a detailed description of the events leading up to the transfers). In May 1995, Chief Judge *142 Politz convened a meeting with Judge McBryde and Chief Judge Buchmeyer in an attempt to resolve informally this dispute over the matters involving the two cases, United States v. Satz, and Torres v. Trinity Industry Inc. See Pl.'s 108(h) ¶ 14. At the meeting, Judge McBryde informed his colleagues that he intended to seek the Judicial Council's assistance in returning these cases to his docket. Id. ¶ 15. In response, Chief Judge Politz "told Judge McBryde that if he sought the assistance of the Judicial Council in resolving the legal issue at the heart of this dispute, his entire career as a judge would be explored." Id. ¶ 16. Notwithstanding this remark, Judge McBryde filed a request for assistance in June 1995, pursuant to 28 U.S.C. § 332. Id. ¶ 19.
In July 1995, an attorney filed a complaint describing Judge McBryde's "obstructive, abusive, and hostile conduct" during trial.[2]Id. ¶ 20. While the controversy over Satz and Torres continued to develop, Chief Judge Politz "identified" other complaints about Judge McBryde. See 28 U.S.C. § 372(c)(1) (authorizing the Chief Judge to identify complaints). On September 13, 1995, Chief Judge Politz appointed a Special Committee pursuant to 28 U.S.C. § 372(c) to investigate the allegations of misconduct that had been levied against Judge McBryde. Pl.'s 108(h) ¶ 24(u). This same committee was also charged with the task of investigating Judge McBryde's request for assistance with Satz and Torres. Id. ¶ 27. The Special Committee held a hearing on Judge McBryde's request for assistance on October 19, 1995.[3]Id. ¶ 29. Although the Judicial Council denied Judge McBryde's request for assistance, id. ¶ 44, the United States Court of Appeals for the Fifth Circuit ultimately granted Judge McBryde's petition for a writ of mandamus and vacated Chief Judge Buchmeyer's reassignment orders. See McBryde I, 117 F.3d at 231.[4]
During the nineteen months between the denial of Judge McBryde's request for assistance and the Fifth Circuit's decision in McBryde I, the Special Committee continued to spar with Judge McBryde. The members of the Special Committee were "concerned about two things: first, that Judge McBryde may have a health problem (mental or physical) which affects his activities as a judge, and second, that Judge McBryde has engaged in a pattern of abusive behavior as a federal judge." Report at 3. These concerns led the Special Committee to seek the advice of two psychiatrists, without Judge McBryde's knowledge or consent. Pl.'s 108(h) ¶¶ 51-54. On the recommendation of the two psychiatrists, the Special Committee asked Judge McBryde to submit to a psychiatric evaluation. Id. ¶ 55. Judge McBryde refused. On July 31, 1996, the Special Committee obtained an order from the Judicial Council requiring Judge McBryde to undergo a full psychiatric examination. Id. ¶ 73. After Judge McBryde initiated a lawsuit challenging the order, the Judicial Council sought a contempt finding against Judge McBryde for violating the order. Id. ¶¶ 76-79. Concerned that the 372(c) investigation was becoming mired in controversy over the psychiatric examination, the Special Committee obtained a stay of these proceedings. Id. ¶ 81.[5]
*143 Two other significant developments occurred during this period. Reacting to the mounting allegations of "repetitive, abusive, and excessive conduct by Judge McBryde beyond the allegations in the five complaints," Chief Judge Politz decided to expand the scope of the investigation pursuant to § 372(c)(5), and Judge McBryde engaged in a series of legal skirmishes with the Judicial Council and the Fifth Circuit over the appropriate forum for subpoenas ad testificandum and duces tecum. See Report at 8; see generally In re McBryde, 120 F.3d 519 ("McBryde II").
On August 25, 1997, the Special Committee's evidentiary hearings finally commenced. Report at 9. The Special Committee Report summarized these proceedings as follows:
The Special Committee conducted evidentiary hearings in New Orleans on August 25 through August 29, 1997 and in Forth Worth on September 29 through October 2, 1997. During the nine days of hearings, the Special Committee received in evidence hundreds of exhibits, mostly court records and transcripts in matters before Judge McBryde. Among the witnesses presented by Special Counsel were four federal District Court Judges; one Texas State Court Judge; a former U.S. Attorney for the Northern District of Texas; the Director of Enforcement of the Securities and Exchange Commission; the head of the Public Defender's Office in Fort Worth; Assistant U.S. Attorneys and Federal Public Defenders; the Clerk of the District Court for the Northern District of Texas; and private attorneys who practiced before Judge McBryde. Judge McBryde's witnesses included private and public attorneys who practiced before him; court personnel; employees of the General Services Administration ("GSA"); former members of juries which decided cases over which he presided; and present and former members of his staff.
Report at 9-10. After digesting evidence about numerous discrete incidents and events spanning Judge McBryde's tenure as a federal judge, the Special Committee concluded that "[w]hen viewed in isolation, the incidents described above run the gamut from outrageous to inappropriate. When viewed together, the incidents bespeak several alarming patterns of conduct exhibited by Judge McBryde over the course of his tenure on the bench." Id. at 124. These patterns fall into five categories: "Proclivity to Question Integrity," id. at 124-27, "Overreactions and Abusive Sanctions," id. at 127-28, "Obsessive Need to Control," id. at 128, "Inappropriate Conduct Toward Fellow Judges," id. at 130-31, and "Effect on the Legal Community," id. at 132-37. On December 4, 1997, the Special Committee published its findings in an extensive and detailed Report. Without repeating every detail of the Special Committee's extensive findings, which comprise over 100 pages of the Report, the Court will briefly recount some of the representative events of Judge McBryde's behavior.[6]
The Special Committee found that Judge McBryde tends to "overreact to perceived transgressions of his rules and expectations or intrusions on his authority." Id. at 127-28. In one incident, Judge McBryde held an attorney in contempt of court when, due to a malfunctioning of the telephone system, the attorney's office was *144 unable to initiate a prompt conference call with the Court and opposing counsel. Id. at 52-55. Although Judge McBryde acknowledged that, "on the surface," holding the attorney in contempt was unfair, he maintained that trial lawyers have to have a "tough skin." Id. at 55. He further justified his severe reprimand by adding that "[t]hings like that have been said to me by judges over the years. It didn't hurt my feelings. That's part of our business." Id. Terrified of Judge McBryde after this incident, and fearful about testifying before the Committee, the attorney accepted a temporary transfer to another district following his appearance as a witness in the Special Committee hearings. Id.
On another occasion, a criminal defense attorney declined to answer a question which Judge McBryde posed because he believed erroneously that his response would waive his client's privilege and redound to his client's detriment. Judge McBryde refused to recess the proceeding to allow the attorney an opportunity to consult with his client or to research the issue before responding to Judge McBryde. Instead, Judge McBryde ordered in open court that the attorney be incarcerated until he agreed to answer the question, holding the attorney in civil contempt of court for not responding to his question. See id. at 57-59. The Special Committee did not focus on whether or not the claimed attorney-client privilege was valid  and the Court of Appeals later found that it was not  but on Judge McBryde's treatment of the attorney. For instance, in reference to Judge McBryde's unwillingness to recess the proceedings to allow the attorney to research an issue which had arisen unexpectedly, the Committee wrote: "There was no exigency warranting this treatment of [the attorney], other than the self-defined exigency of Judge McBryde to complete the proceeding once it had begun." Id. at 59.
In a different case, an attorney received a call from chambers at 4:50 p.m. to inform him that, in response to his motion to continue a sentencing, the court had scheduled a hearing for 9:00 a.m. the following morning, and would require the physician to testify live at the hearing as to his client's medical condition necessitating continuance of the sentencing. The attorney was able only to arrange for the physician to participate in a telephone conference call before the physician left town. Judge McBryde first ordered the attorney ejected from the courtroom, and later, upon permitting him to reenter, questioned the attorney in a belittling fashion about his knowledge of the use of subpoenas. See id. at 89-91.
These and other such examples describe incidents in which counsel appearing before Judge McBryde attempted to explain, on the record, why they had been unable to comply with the Court's orders. Judge McBryde, however, refused to listen to the attorneys' explanations, cut them off, and dealt with them in a humiliating and sarcastic manner. Without commenting on the merits of the lawyers' explanations, the Special Committee found that the sanctions Judge McBryde meted out were disproportionate to the perceived infractions, and that "this tendency to overreact and to impose disproportionate sanctions makes conducting trials or other proceedings before Judge McBryde extremely stressful on some lawyers." Id. at 127-28. As all attorneys and judges are aware, collateral consequences involving the state bar association attach when a judge finds an attorney in contempt of court. Moreover, federal prosecutors in particular bear an obligation to report to the Office of Professional Responsibility of the Department of Justice when a federal judge accuses them of dishonesty. See id. at 82 n. 33.
The Special Committee also found that Judge McBryde exhibited a tendency to accuse attorneys of mendacity without taking even the most rudimentary "steps to verify whether or not his suspicion of bad faith on the part of others is justifiable." *145 Id. at 126.[7] In one such incident, he accused government counsel of negotiating in bad faith in violation of a local rule during a settlement discussion, and threatened sanctions against the attorney solely on the basis that counsel would not agree to a provision in the settlement agreement that the enforcement order be sealed from public view. Id. at 12. On the record, Judge McBryde berated counsel and disparaged his position that the need for public disclosure was a principle of law enforcement critical to the government agency. Id. at 12-14. When the attorney steadfastly adhered to the principle of full disclosure, Judge McBryde reacted in such an angry and accusatory manner that government counsel met with his colleagues to discuss his fear that he might be held in contempt and incarcerated. Id. at 14. Again, the Special Committee focused on Judge McBryde's treatment of this and other attorneys rather than on whether or not Judge McBryde was correct on the merits of his determination that the order should be sealed.[8]
In a similar incident, Judge McBryde again concluded that government counsel were not acting in good faith in settlement proceedings when they failed to make a monetary settlement offer to a plaintiff. Id. at 38. He issued a show cause order as to why they should not be held in contempt and conducted a lengthy hearing to inquire into the attorneys' reasoning for not making such an offer, the transcript of which the Special Committee found to include "dozens of pages of invective" by Judge McBryde. Id. at 37-39. Characterizing the government's motion for summary judgment in this case as "an affront to the Court," Judge McBryde "issued a broad attack on the integrity of the entire [office]," suggesting that its attorneys were "`not always candid with the Court.'" Id. at 38. Without regard to the accuracy of Judge McBryde's allegations, the Special Committee found that "the sarcastic and abusive language used by Judge McBryde is itself a cause of concern. There was simply no good reason to belittle and attack [the attorneys] in such a repetitive and relentless manner." Id. at 39.[9]
On another occasion, Judge McBryde ordered on the record in open court that an attorney attend fifteen hours of a remedial reading course  and submit an affidavit attesting to her compliance with this mandate  because of her failure to adhere to Judge McBryde's standing order that each party appear in person at settlement conferences. Id. at 21-22. After imposing this humiliating sanction, he rejected her initial affidavit of compliance, questioning *146 her integrity, and required that she submit a new one which set out in detail the dates, times, and places of attendance. Id. at 22. A separate incident involved one trial attorney's failure to remain in continuous contact with the court during jury deliberations. When Judge McBryde's chambers informed the attorney that the deliberating jury had recessed for lunch, the attorney left the courthouse. Id. at 26-27. Chambers had advised the attorney in error, though, as the jury had decided to forgo lunch and to continue to deliberate, reaching a verdict while the attorney remained unavailable for 45 minutes. Id. at 27. As a result, Judge McBryde ordered that the delinquent attorney and every attorney in his office wait, without exception, on the fourth floor of the courthouse throughout jury deliberations in any case before him, including through any lunch break or recess of the deliberations. This order remained in effect for sixteen months. Id. at 27-30. It was lifted only when an attorney from that office had to try a case before Judge McBryde on another floor while simultaneously required to wait on the fourth floor in compliance with Judge McBryde's order. Id. at 28-29. The Special Committee found that these incidents and others reflect "an abusive tendency," a "lack of judicial temperament," id. at 127, and an "obsessive need to control" other persons and proceedings, id. at 129.
Additionally, the Special Committee listened to testimony suggesting that attorneys who otherwise would have asked certain questions or marshaled certain arguments in order to make their record felt so intimidated by Judge McBryde, and so fearful that he would undermine them openly before a jury, that they stifled their better litigation judgment. For example, one attorney testified that, when trying a case before Judge McBryde, he and others in his office generally declined to pose questions during jury voir dire out of fear that Judge McBryde would humiliate them in front of prospective jurors. Id. at 120. Others offered similar examples of the extent to which Judge McBryde's harsh, ridiculing, and seemingly arbitrary treatment of lawyers appearing before him exercised a chilling effect on those attorneys' zealous representation of their clients. See, e.g., id. at 111-13, 115-16. The Special Committee found this behavior on Judge McBryde's part to be particularly troubling, suggesting that "the cumulative effect of his trial procedures impedes the ability of lawyers to try their cases." Id. at 122 (citing Sims v. ANR Freight System, Inc., 77 F.3d 846, 850 (5th Cir.1996)). One government counsel testified that his entire office anticipated appearances before Judge McBryde with great trepidation, and that the office had to stay on constant guard lest the attorneys make litigation decisions  such as settlement offers  out of fear rather than considered legal judgment. Id. at 133-34. As a general matter, the Special Committee emphasized the breadth of "Judge McBryde's negative effect on the Fort Worth legal community ...." Id. at 135. Notwithstanding its severity and manifestly negative repercussions, the Special Committee underscored the fact that Judge McBryde's intemperate and abusive behavior eluded redress except through the kind of disciplinary channel contemplated by the Act. In the words of the Special Committee,
[t]he very nature of the effect of Judge McBryde's pattern of conduct  the failure of lawyers to act; the decision to forgo asking questions or moving for relief; the sleepless nights; the refusal to accept cases; the decision to seek employment elsewhere; the compromising of advocacy as a form of self-protection  cannot be remedied through the appellate process and often cannot even be articulated in isolation. Nevertheless, the harm to the administration of justice is palpable and must be redressed.
Id. at 137.
Finally, the Special Committee heard testimony recounting interactions between *147 Judge McBryde and other members of the Judiciary, both Federal and State, in which Judge McBryde behaved in a disrespectful and offensive manner. For instance, an attorney was involved in a jury trial before a state judge at the same time that Judge McBryde had scheduled the attorney to appear at a pretrial conference. See id. at 60. Concerned about the prospective overlap, counsel filed a request for a continuance on the day before the pretrial conference. Judge McBryde denied the request. Id. Surprised because jury trials usually take precedence over other matters, counsel alerted the state court judge to the conflict. The state court judge suggested that he and counsel arrive early in court to place a joint call to Judge McBryde in order to assure him that the attorney was in fact in trial. Id. Finding Judge McBryde not yet in his chambers, the two left a message to this effect; the state court judge specifically requested that Judge McBryde telephone him to discuss the conflict, since he was willing to leave the bench to accept Judge McBryde's call. Id. at 61.
Having received no word from Judge McBryde shortly before the pretrial conference was scheduled to commence, the state court judge excused the attorney and recessed the trial, leaving the jury waiting for counsel's return. Id. At that point, the state court judge determined to see Judge McBryde privately in order to explain the situation. Along with his court reporter who drove him to federal court, leaving behind her reporting equipment, the state court judge traveled to Judge McBryde's chambers where he was directed to wait in a conference room along with two lawyers who were participating in the pretrial matter. Id. Shortly thereafter, one of Judge McBryde's law clerks entered the conference room, obviously embarrassed, to deliver a message to the state court judge from Judge McBryde that "Judge McBryde told me to tell you that you are not welcome here and you are to leave." Stunned, the state court judge departed after requesting that Judge McBryde release the trial counsel as soon as possible, since a jury awaited his return to resume the trial. Id. at 62. By way of explanation for this conduct, Judge McBryde asserted that he assumed the state court judge had come to engage in a confrontation.[10]Id. at 63-64. As evidenced by this incident, Judge McBryde was quick to impute improper motives and bad faith not only to attorneys appearing before him, but also to his peers, whom he treated in a like manner. See id. at 64.
In its Report, the Special Committee ultimately recommended that Judge McBryde be given a choice: to retire voluntarily, id. at 151-52, or to face sanctions, including a public reprimand, id. at 152, suspension of all new case assignments to Judge McBryde for one year, id. at 152-54, and disqualification of Judge McBryde for a period of three years in any case involving a lawyer whom the Special Committee had identified as a potential witness at the hearing, id. at 154-58.

C. Action by the Judicial Council and the Review Committee
On December 17, 1997, the Judicial Council for the Fifth Circuit held a hearing to consider the Special Committee's Report and Judge McBryde's response thereto. See Pl.'s 108(h) Stmt. ¶ 134. Two weeks later, on December 31, the Judicial Council published its order and public reprimand, adopting the Special Committee's Report, findings of fact, and recommendations "[t]o the extent relevant to the action" *148 that the Council pursued. See Order and Public Reprimand. Rather than attempt to summarize the Order and Public Reprimand, the Court shall take advantage of its brevity to reproduce it in full:
WHEREAS a Special Investigating Committee of the Council (the "Special Committee"), pursuant to 28 U.S.C. § 372(c)(5) and Rule 9(A) of the Fifth Circuit's Rules Governing Complaints of Judicial Misconduct or Disability, conducted an investigation, held hearings over nine days during which over fifty witnesses testified, and received evidence regarding complaints against, and the conduct of, Judge John H. McBryde of the United States District Court for the Northern District of Texas;
WHEREAS, pursuant to 28 U.S.C. § 372(c)(5), the Special Committee issued a report to the Council dated December 4, 19997; and
WHEREAS the Council has considered the record, the Special Committee's Report, the Responses thereto, and statements by counsel and Judge McBryde at the Council's December 17, 1997 meeting.
To the extent relevant to the action taken below, the Council adopts by a clear majority vote the Special Committee's Report, Findings of Fact, and Recommendations. Based thereon:
1. The Council hereby PUBLICLY REPRIMANDS Judge McBryde, pursuant to 28 U.S.C. § 372(c)(6)(B)(vi), for conduct prejudicial to the effective and expeditious administration of the business of the courts within the Circuit and inconsistent with Canon 2(A) and Canon 3(A)(3) of the Code of Conduct for United States Judges.
Judge McBryde has engaged in a continuing pattern of conduct evidencing arbitrariness and abusiveness that has brought disrepute on, and discord within, the federal judiciary. This conduct is unacceptable and damaging to the federal judiciary.
Judge McBryde's intemperate, abusive and intimidating treatment of lawyers, fellow judges, and others has detrimentally affected the effective administration of justice and the business of the courts in the Northern District of Texas. Judge McBryde has abused judicial power, imposed unwarranted sanctions on lawyers, and repeatedly and unjustifiably attacked individual lawyers and groups of lawyers and court personnel. This pattern of behavior has had a negative and chilling impact on the Forth Worth legal community and has, among other things, prevented lawyers and parties from conducting judicial proceedings in a manner consistent with the norms and aspirations of our system and is harmful to the reputation of the courts.
2. Pursuant to 28 U.S.C. § 372(c)(6)(B)(iv), no new cases are to be assigned to Judge McBryde for a period of one (1) year from the effective date of this Order; and
3. Pursuant to 28 U.S.C. § 372(c)(6)(B)(vii), Judge McBryde, for a period of three (3) years from the effective date of this Order, is not to participate in (i) cases now pending before him (other than any as to which there are appellate proceedings) in which any of the attorneys listed on Attachment A are currently involved, and (ii) any and all cases filed after the effective date of this order in which the initial notice of appearance includes any of the attorneys listed on Attachment A.
4. Consistent with 28 U.S.C. § 332(d)(2), the Council directs all judicial officers and employees within the Circuit, particularly the Chief Judge of the Northern District of Texas and the Clerk of the Court for the Northern District of Texas, to take all necessary steps to carry into effect the above orders of the Council.
5. The Council hereby directs that implementation of this Order and Public Reprimand shall be stayed for 30 days *149 after entry so that Judge McBryde may seek to appeal to, and obtain an additional stay from, the Judicial Conference of the United States. This Order shall also remain sealed during the period of any stay thereof.
This order is issued on the date recited below but shall not become effective until all stays have expired or been lifted.
New Orleans, Louisiana, this 31st day of December 1997.
In this Order, the Judicial Council disciplined Judge McBryde with three sanctions: (1) a public reprimand; (2) suspension of all new case assignments for one year; and (3) suspension from participation of cases involving twenty-three attorneys who had testified against him at the hearings. Although the Judicial Council stayed implementation of its order for 30 days pending any appeal by Judge McBryde, Judge McBryde filed an application for a further stay to permit him additional time to petition the Judicial Conference Committee to Review Circuit Council Conduct and Disability Orders ("Review Committee") for review. Pl.'s 108(h) ¶¶ 169-172. The Review Committee agreed to stay the Order and Public Reprimand, with the exception of paragraph 3, until March 16, 1998, by which time Judge McBryde was required to file his intended petition for review.
On March 16, 1998 Judge McBryde filed seven petitions for review of the judicial council's actions. See 28 U.S.C. § 372(c)(10) (authorizing a complainant, judge, or magistrate aggrieved by an action of the judicial council, taken in response to the report of a special investigating committee, to petition the Judicial Conference of the United States for review). After evaluating Judge McBryde's petitions and all of the responsive briefs, the Review Committee issued a Memorandum and Order on September 18, 1998 in which it substantially affirmed the Judicial Council's Order.[11]See Review Committee Order at 27. As its sole modification, the Review Committee authorized the Judicial Council to curtail the one-year period of Judge McBryde's new case assignment sanction if it "finds that Judge McBryde's conduct indicates that he has seized the opportunity for self-appraisal and deep reflection in good faith and that he has made substantial progress toward improving his conduct." Id. at 24.

D. Proceedings in this Court
On October 15, 1998, Judge McBryde filed an eight-count Complaint in this Court against the Review Committee and its chairperson, Judge Bauer, and against the Judicial Council and its chief judge, Chief Judge Politz. Five days later, on October 20, Judge McBryde filed a motion for a temporary restraining order. The United States moved, and on November 5, 1998 the Court granted its request, to intervene for the limited purpose of defending the Act against Judge McBryde's facial constitutional challenges. See Order of Nov. 5, 1998. Although Judge McBryde *150 initially indicated his preference that the litigation proceed in three stages  a temporary restraining order, a preliminary injunction, and a trial on the merits for declaratory and injunctive relief  he agreed to the Court's proposal that, in the interests of conserving resources and achieving a prompt resolution of the issues, the latter two stages be consolidated. See generally Transcript of October 22, 1998 Phone Conference; Court's Order of October 23, 1998 (stating that "the Court's consideration of a preliminary injunction would be consolidated with a trial on the merits and adjudicated via cross-motions for summary judgment"). On November 2, 1998, the Court denied Judge McBryde's motion for a temporary restraining order, finding that Judge McBryde had not demonstrated that he would suffer irreparable harm if denied injunctive relief. See generally Mem. Op. and Order of November 2, 1998; CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.Cir.1995) (enumerating the factors a district court should weigh in determining whether to grant a temporary restraining order). Notwithstanding his earlier agreement, and after the parties had fully briefed their cross-motions for summary judgment, Judge McBryde moved for a preliminary injunction on December 9, 1998. The Court denied this motion on January 5, 1999 for substantially the same reasons it denied Judge McBryde's earlier motion for a temporary restraining order. See generally Mem. Op. and Order of Jan. 5, 1999. On June 11, 1999, the Court conducted a hearing for oral argument on the remaining motions.
Judge McBryde also requested, in two separate motions, leave to take discovery in the form of depositions, and in a third motion to continue the pending cross-motions for summary judgment until he had the opportunity conduct those depositions. In particular, Judge McBryde sought to depose participants in the § 372(c) proceedings in the hopes of eliciting facts to controvert the portion of the Judicial Council's Order which asserts that the Council had considered the record, the Report, and Judge McBryde's responses thereto, for the purpose of fashioning its Order and Public Reprimand. The Court denied these motions on September 30, 1999, after determining that Judge McBryde had failed to make a sufficient showing of bad faith or improper motive to justify engaging in discovery. See generally Mem. Op. and Order of September 30, 1999; see also Saratoga Development Corp. v. United States, 21 F.3d 445, 458 (D.C.Cir.1994) (holding that, under the APA, discovery is warranted only "when `there has been a strong showing of bad faith or improper behavior' (so that without discovery the administrative record cannot be trusted)") (quoting Community for Creative Non-Violence v. Lujan, 908 F.2d 992, 997 (D.C.Cir.1990)).
The Court also denied Judge McBryde's Motion to Deem Admitted Statement Contained in Statement of Material Facts. Judge McBryde contended that, since neither Defendants nor the United States had complied fully with the requirements of the District of Columbia Local Rule 7.1(h) (formerly 108(h)) (mandating that each party file a concise statement setting forth all material facts as to which a genuine issue exists), the Court should act within its discretion to deem admitted the contents of his 7.1(h) Statement. The Court declined to do so, finding that the alleged deficiencies in Defendants' and the United States' responses to Judge McBryde's 7.1(h) Statement derived from their contention that the finality clause limited this Court's review to the findings contained in the Special Committee's Report, the Judicial Council's Order, and the Review Committee's Memorandum and Order. See Mem. Op. of Sept. 30, 1999 at 4-5. Finally, the Court issued an Amended Protective Order releasing certain aspects of the record from the prior sealing order and maintaining others under seal. The confidentiality of the record and the pleadings in this case has presented a series of issues which the Court has resolved along *151 the way. A detailed discussion of these issues and their resolution appears infra in Section D of the Court's discussion.

II. DISCUSSION
The Court has divided its discussion of the eight counts of Judge McBryde's complaint into four principal parts. First, the Court will consider Judge McBryde's contention that the Act is unconstitutional on its face because it violates the separation of powers doctrine. Second, the Court will examine its jurisdiction to entertain Judge McBryde's non-constitutional claims and his claims that the Act is unconstitutional as it has been applied to him.[12] Third, the Court shall consider the as-applied portion of Judge McBryde's separation of powers claim and his due process challenge to the Act's application. Finally, the Court will assess Judge McBryde's argument that the confidentiality clause violates the First Amendment.

A. Judge McBryde's Claim that the Act is Facially Unconstitutional
In Count I of his complaint, Judge McBryde contends that "the Act is unconstitutional on its face as it applies to Article III judges because the Act empowers agencies of the Judicial Branch to punish, or change the status of, an Article III judge in violation of the constitutional scheme that the only procedure by which an Article III judge can be disciplined, or have his or her status changed, is by impeachment through the constitutional impeachment process." Compl. ¶ 72. Judge McBryde acknowledges the legitimacy of three mechanisms for addressing claims of judicial misconduct: appellate or mandamus review by a duly constituted Article III court; impeachment by constitutionally ordained methods; or criminal prosecution. Under Judge McBryde's analysis, the Act runs afoul of this carefully balanced scheme by allowing the Judicial Branch to exercise Congress's exclusive impeachment power (Count I), and by authorizing administrative entities that are not Article III courts to conduct appellate review of his judicial decisions (Count II). As a result of these alleged incursions into the constitutionally protected sphere of judicial decision-making, Judge McBryde further contends that the Act compromises the constitutionally enshrined principle of judicial independence (Count III).
The Court's analysis of Judge McBryde's separation of powers claims is guided by Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), in which the Supreme Court rejected a separation of powers challenge to the Sentencing Guidelines promulgated by the United States Sentencing Commission. Analyzing the petitioner's claim that the Sentencing Reform Act violated the separation of powers principle, the Court carefully set forth the parameters of this important doctrine. The Constitution is not offended by some degree of commingling of functions among the three Branches, the Court held, so long as the challenged statute "pose[s] no danger of either aggrandizement or encroachment." Mistretta, 488 U.S. at 382, 109 S.Ct. 647 (citing Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (upholding judicial appointment of independent counsel); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (upholding agency's assumption of jurisdiction over state-law counterclaims)). Thus, the Act will be unconstitutional only if it "accrete[s] to a single Branch powers more appropriately diffused among separate Branches or undermine[s] the authority and independence of one or another coordinate Branch." Id. Where, as here, the Judicial Branch is implicated in a separation of powers challenge, the Court emphasized the need for particular *152 "vigilance against two dangers: first, that the Judicial Branch neither be assigned nor allowed `tasks that are more properly accomplished by [other] branches,' and, second, that no provision of law `impermissibly threatens the institutional integrity of the Judicial Branch.'" Id. at 383, 106 S.Ct. 3245 (internal citations omitted). With these concerns in mind, the Court will turn to the merits of Judge McBryde's three separation of powers claims.

1. Whether the Act Endows the Judicial Branch with Powers More Appropriately Exercised by Other Branches (Count I)
At the heart of Judge McBryde's separation of powers argument is his contention that the Act impermissibly authorizes the Judicial Branch to exercise Congress's exclusive power to remove a sitting judge from office. Both the language of the Act and its legislative history, however, make it abundantly clear that the Judicial Branch is not so empowered. The Senate Judiciary Committee Report on the Judicial Council's Reform and Judicial Conduct and Disability Act of 1980 discussed this issue at length, carefully weighing contemporaneous suggestions that the Act's mechanisms might encroach on the impeachment power. See S.Rep. No. 96-362, at 4-6, reprinted in 1980 U.S.C.C.A.N. 4315, 4318-20. In response to concerns that removal of a sitting judge by any means other than impeachment would be unconstitutional, the statute was drafted to satisfy the "growing public demand for accountability" without interfering with the impeachment mechanism. Id. at 5. The language of the Act therefore expressly prohibits removal, providing that "in no circumstances may the council order removal from office of any judge appointed to hold office during good behavior." 28 U.S.C. § 372(c)(6)(B)(vii). As an additional safeguard against encroachment of the impeachment power, the remedial measures are narrowly drawn such that they may not effect the removal of a sitting judge from office. See id. § 372(c)(6)(B)(iv) (granting power to suspend new case assignments, but only "on a temporary basis for a time certain"); id. § 372(c)(6)(iii) (authorizing the judicial council to request retirement, but not to order it).
Considering a similar attack on the constitutionality of the Act, the Eleventh Circuit rejected "the argument that the Act is unconstitutional because any measures which may place pressure on a judge constitute a form of removal from office by means other than by impeachment." In re Certain Complaints, 783 F.2d 1488, 1507 (11th Cir.1986) ("Hastings II"). Similarly, the Senate Judiciary Committee concluded that the Act creates a "supplement to, but not a substitute for, the seldom used process of impeachment." Id. at 3. Because the scope of its remedial measures does not extend to actual removal from office, the Act plainly does not usurp or encroach upon the Legislative Branch's exercise of the impeachment power. See Mistretta, 488 U.S. at 393, 109 S.Ct. 647 (approving the location of the Sentencing Commission within the Judicial Branch, in part, because it does not "trench upon the prerogatives of another Branch").
Judge McBryde's alternative "absence of power" argument is equally devoid of merit. In this regard, Judge McBryde adopts the views espoused by Justices Black and Douglas dissenting in Chandler. See Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 135-37, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (arguing that the constitutional silence as to other means of judicial discipline should be interpreted as an absolute prohibition) (Douglas, J., dissenting). Whereas Justice Douglas concluded that "[u]nder the Constitution the only leverage that can be asserted against [a sitting judge] is impeachment," id. at 136, 90 S.Ct. 1648, the view that ultimately carried the day held that the "extraordinary machinery of impeachment" cannot be the only recourse in *153 cases of alleged judicial misconduct involving intemperate or abusive behavior, id. at 85, 90 S.Ct. 1648. See also Mistretta, 488 U.S. at 387, 109 S.Ct. 647 (noting that Chandler specifically upheld the Congress's ability to vest in judicial councils authority to "make all necessary orders for the effective and expeditious administration of the business of the courts"); Hastings v. Judicial Conference of the United States, 593 F.Supp. 1371, 1380 (D.D.C. 1984) (Gesell, J.) (finding that the judiciary has the "inherent power" to take reasonable disciplinary measures), aff'd in part and vacated in part, 770 F.2d 1093 (D.C.Cir.1985) ("Hastings I").[13] In Hastings II, the Eleventh Circuit determined that the Act's remedial measures do not "intrude upon Congress's sole power of removal or impeachment." 783 F.2d at 1509. Read together, Chandler and Hastings II stand for the proposition that Congress's impeachment power presents no obstacle to attempts to enforce reasonable rules of conduct via sanctions short of removal. See Chandler, 398 U.S. at 85, 90 S.Ct. 1648 (confirming the judiciary's inherent authority to put its "own house in order"); Hastings II, 783 F.2d at 1509; Hastings I, 770 F.2d at 1099. Impeachment may be the only means of removing a judge, but the Court agrees with the Defendants that it is not the only means by which a judge can be disciplined for judicial intemperance and despotic behavior not always susceptible to review by other means.

2. Whether the Act Threatens the Institutional Integrity of the Judicial Branch (Count III)
There can be no question that the independence of the judiciary is a "fundamental precept[ ] upon which our systems of government is founded." Hastings I, 770 F.2d at 1104 (Edwards, J., concurring). In the hallowed words of Alexander Hamilton, the "independence of the judges is ... requisite to guard the constitution and the rights of individuals [against legislative encroachments and] from the effects of those ill humors which the arts of designing men, or the influence of particular conjectures, sometimes disseminate among the people themselves." The Federalist No. 78, at 527 (A. Hamilton) (J. Cooke ed.1961). Indeed, the Supreme Court has stressed "the imperative need for total and absolute independence of judges in deciding cases or in any phase of the decisional function." Chandler, 398 U.S. at 84, 90 S.Ct. 1648; see also Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 60, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (stating that the Constitution "commands that the independence of the judiciary be jealously guarded, and ... provides clear institutional protections for that independence"). To that end, the Constitution guarantees that individual judges shall "hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. Art. III. § 1. These protections are counterbalanced to some extent by the impeachment power, which allows the Legislative Branch to remove judges from office under certain circumstances. See id., art. I, §§ 2, 3. Together, these safeguards were designed to insulate the Judicial Branch  both the institution and the individual decision-makers that comprise it  from undue influence emanating from its coordinate Branches, while ensuring some degree of accountability.
Congress supplemented these constitutional measures almost immediately with various statutory limitations on the independence of individual judges. See Hastings, 593 F.Supp. at 1379 (providing examples of limitations placed on individual judges by the first Congress). Some examples *154 curtailing particular activities include criminalization of bribery, Act of 1790, ch. 9, sec. 21, 1 Stat. 117; the recusal requirement, Act of May 8, 1792, ch. 36, sec. 11, 1 Stat. 278 (codified at 28 U.S.C. § 455); and the prohibition on the practice of law by judges, Act of December 18, 1812, ch. 5, 2 Stat. 788 (codified at 28 U.S.C. § 454). See Hastings, 593 F.Supp. at 1379. Over the years, as the Judicial Branch grew, its members came to recognize the need for "a statutory framework and power whereby they might `put their own house in order.'" Chandler, 398 U.S. at 84, 90 S.Ct. 1648. This goal was first realized in 1939 with the creation of the judicial councils and the Judicial Conference, the constitutionality of which "seems to be established." Hastings I, 770 F.2d at 1099. The Judicial Conduct and Disability Act represents the latest in this series of measures designed to protect the integrity of the judiciary as a whole by placing limits on the independence of individual judges. See In re Petition to Inspect, 735 F.2d 1261, 1265-66 (11th Cir.1984) (finding the broad purposes of the Act to be preservation of the integrity of the judiciary, maintaining public confidence in the judicial process, and strengthening judicial independence). The Act is unique among these measures, however, in that it places the onus on the Judicial Branch actively to police the conduct of its own members, a responsibility willingly assumed by the Judicial Branch when it collaborated with Congress in fashioning this legislation.
Judge McBryde maintains that judicial independence resides primarily in the unfettered autonomy of individual judges, and that this independence is fatally compromised by giving one judge power over another. The Chandler Court divided on precisely this question. Writing for the Court, Justice Burger apparently rejected the notion "that each judge in a complex system shall be the absolute ruler of his manner of conducting judicial business." Chandler, 398 U.S. at 84, 90 S.Ct. 1648; see Hastings II, 783 F.2d at 1505 (reading Chandler "as rejecting any fixed notion ... that courts are mere collections of individual judges, each of whom is a complete law unto himself or herself."). Concurring in the judgment, Justice Harlan implicitly preferred institutional independence over individual independence when he specifically approved the judicial council's use of its statutory powers to remedy "what the Council members perceived as a threat to public confidence in the administration of justice." Id. at 125, 90 S.Ct. 1648. Judge McBryde's understanding of judicial independence, though, most closely approximates the dissenting views of Justices Black and Douglas, who would have held that the principle of judicial independence bars the judiciary from censuring or otherwise disciplining its own members. See id. at 136-38, 90 S.Ct. 1648. Hastings II characterized the difference between the Chandler majority and the dissenters as follows: "The key to the disagreement ... may well lie in the fact that whereas the dissenters saw the realm of judicial independence to be all-encompassing, the majority located a judge's protected independence more narrowly, `in deciding cases or in any phase of the decisional function.'" Hastings II, 783 F.2d at 1506-07 (quoting Chandler, 398 U.S. at 84, 90 S.Ct. 1648). Hastings II went on to affirm that the judicial council's power to discipline "does not transgress the Constitution's vision of the independence of each Article III judge..... The judiciary could hardly function if judicial councils were powerless to exercise powers of moral suasion or censure, where a judge is felt to be bringing discredit on the court through disability, infirmity, incompetence or misconduct." Id. at 1509; see also Harry T. Edwards, Regulating Judicial Misconduct and Divining `Good Behavior' for Federal Judges, 87 Mich. L.Rev. 765, 784 (1989) (concluding that "individual judges are subject to some measure of control by their peers with respect to behavior or infirmity that adversely affects the work of the court and that does not rise to the level of impeachable conduct").
*155 In light of these precedents, the Court rejects Judge McBryde's argument that judge-on-judge discipline is inherently unconstitutional.[14] As the framers of the 1990 amendments to the Act recognized, judicial independence and judicial accountability "are partners in maintaining the respect and confidence necessary to the effectiveness of the Federal judiciary." H. Rep. No. 101-512, at 8 (internal quotations omitted), reprinted in 1990 U.S.C.C.A.N. 6879, 6882. The Court concurs with Judge Gesell's observation that "the Framers never intended that the independence of any one officeholder, including judges, be so absolute as to threaten the integrity and orderly functioning of that officeholder's branch of government." Hastings, 593 F.Supp. at 1379. In order to answer the question of whether the Act erodes judicial independence, the Court must consider both the independence of individual judges and the independence of the judiciary as an institution. See, e.g., Hastings II, 783 F.2d at 1509 (evaluating separation of powers challenge to the Act by balancing the pressure placed on individual judges against institutional values).
Ultimately, Judge McBryde's facial judicial independence challenge fails because the powers exercised by the Judicial Branch under the auspices of the Act are not incompatible with the central mission of that Branch. See Mistretta, 488 U.S. at 388, 109 S.Ct. 647. Rejecting a similar argument raised by Judge Hastings, the Eleventh Circuit wrote that the Act "does not ask judges to promote some interest lying outside the immediate concerns of the judicial branch, nor does their membership on investigating committees and judicial councils make them less impartial." Hastings II, 783 F.2d at 1504 (contrasting judicial participation in addressing allegations of judicial misconduct with judicial participation in fighting organized crime). To the contrary, Hastings II found that "the investigating judges here are concerned solely with matters affecting the management and reputation of the judiciary itself." Id. The most natural guardians of judicial independence are judges themselves, whose interests are most closely aligned with those of the subject judge. Judge Edwards' commentary underscores this point:
Judges cherish the principle of judicial independence. Every judge understands that judicial independence would be lost if individual judges were allowed to be dominated by the group. If one individual must forfeit his or her independence, a precedent is established that will threaten every member of the group. Judges will not tolerate this; thus, no member of the group is likely to discipline another without great caution. .... Overall, judges' naturally empathetic and disapproving impulses will blunt each other, leaving them as the best people, from a practical standpoint, to carry out the judicial policing function.
Edwards, Regulating Judicial Misconduct, 87 Mich. L.Rev. at 780. Indeed, no other Branch could perform this essential function without raising serious separation of powers objections. Hastings II, 783 F.2d at 1505. The integrity of the institution, with respect to both public trust and freedom from outside influence, can be preserved only if judges shoulder the difficult *156 responsibility of monitoring their own conduct. Judicial supervision fortifies judicial independence and thus must be entrusted only to the judiciary.

3. Whether the Act Allows Improper Exercise of Article III Power (Count II)
The third and final manifestation of Judge McBryde's facial challenge to the Act on separation of powers grounds is his argument that the Act authorizes administrative bodies within the Judicial Branch to sanction a judge because of disagreement with the merits of his or her rulings, effectively reversing his or her judicial decisions outside the constitutionally mandated confines of an Article III court. On its face, however, the Act clearly precludes review of a judge's judicial decisions. Section 372(c)(3) provides that the chief judge may dismiss a complaint "if he finds it to be ... directly related to the merits of a decision or procedural ruling." 28 U.S.C. § 372(c)(3)(A). Congress enacted this provision in order to "protect the independence of a judge in making decisions by precluding use of the complaint mechanism to collaterally attack rulings." In re Complaint of Judicial Misconduct, 37 F.3d 1511, 1515 (U.S.Jud.Conf.1994) (citing H.R.Rep. No. 96-1313, at 10 (1980)); see also McBryde I, 117 F.3d at 230 (finding that the Act prohibits review of the merits of judicial decision). This provision serves as an additional bulwark against incursions into the constitutionally protected sphere of judicial decision-making.
For this reason, the Act presents no facial violation of Article III's case and controversy requirement. In Mistretta, the Court squarely held that judges could serve on the Sentencing Commission even though the Commission's work did not involve the exercise of judicial power in the "constitutional sense of deciding cases and controversies." Mistretta, 488 U.S. at 389, 109 S.Ct. 647. The Court reached this conclusion in large part because it found that the responsibilities shouldered by the judges on the Commission were closely related to the central mission of the judiciary. See id. at 391, 109 S.Ct. 647. By the same token, there is nothing inherently objectionable about a group of judges acting in an administrative capacity to investigate and remedy "conduct prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 372(c)(1); Hastings II, 783 F.2d at 1506-07. As the Court commented in Chandler, albeit in dicta, "[w]e can see no constitutional obstacle preventing Congress from vesting in the Circuit Judicial Councils, as administrative bodies, authority to make `all necessary orders for the effective and expeditious administration of the business of the courts within (each) circuit.'" Chandler, 398 U.S. at 85 n. 7.
Having considered each of Judge McBryde's arguments that the Act is unconstitutional on its face because it upsets the balance of power among the three Branches, the Court concludes that the Act passes constitutional muster. The Act does not encroach upon Congress's impeachment powers, nor is it "preempted" by those powers. The tasks assigned to the judicial councils are essential to the central mission of the Judicial Branch, and could not be lodged elsewhere without occasioning grave concern. With the active assistance of the Judicial Branch, Congress painstakingly drafted the statute to avoid precisely these concerns. Judge McBryde has highlighted several areas where the Act's mechanisms could be used for nefarious purposes, but the potential for abuse is clearly outweighed by the Act's important role in preserving and protecting judicial independence. Upon close scrutiny, the Court concludes that Judge McBryde's claims that the Act violates the separation of powers doctrine are "`more smoke than fire,' and do not compel us to invalidate Congress's considered scheme for resolving the seemingly intractable dilemma" of remedying judicial misconduct. Mistretta, 488 U.S. at 384, 109 S.Ct. 647.

*157 B. Potential Limits on this Court's Jurisdiction
Before turning to the merits of Judge McBryde's remaining claims  which range from constitutional challenges to the validity of the Act as it was applied to him, to very specific claims that certain aspects of the investigation violated the Act and the Complaint Rules  the Court must first consider what limits, if any, the Act's finality clause, 28 U.S.C. § 372(c)(10), places on this Court's jurisdiction over Judge McBryde's claims. Section 372(c)(10) states in relevant part that "all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." The parties agree that this section does not deprive the Court of jurisdiction to hear Judge McBryde's facial constitutional claims, but its application to Judge McBryde's as-applied and statutory claims is hotly contested. Relying on the Supreme Court's directive that "only upon a showing of `clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review," see Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (citations omitted), Judge McBryde suggests that the only aspect of the proceedings insusceptible to review is the Judicial Council's 1997 Order. The Defendants take a much broader view of the finality clause, arguing that it deprives this Court of jurisdiction to hear any non-constitutional claims or as-applied constitutional claims. In order to resolve this difficult issue, which will have a profound impact on the Court's resolution of Judge McBryde's remaining claims, the Court must consider the express language of the statute, "the structure of the statutory scheme, its objectives, its legislative history and the nature of the administrative action involved." Block v. Community Nutrition Institute, 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).
On its face, the finality clause "expressly limits the availability of review of orders and determinations made under the Act." Hastings I, 770 F.2d at 1096. Section 372(c)(10) defines a narrow universe of options for a complainant, judge, or magistrate aggrieved by decisions rendered during the course of a § 372(c) proceeding. See 28 U.S.C. § 372(c)(10). If a complainant, judge, or magistrate is aggrieved by a final order of the chief judge, he or she may petition the judicial council of the circuit for review. See id. Similarly, a person aggrieved by an action of the judicial council may petition the Judicial Conference for review. See id. Aside from those enumerated avenues of redress, the finality clause declares that "all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." Id.
At the motions hearing, counsel for Judge McBryde urged the Court to take a very narrow view of the phrase "orders and determinations" as it is used in the finality clause. See Transcript of June 11, 1999 Hearing at 43-47 ("Tr."). According to Judge McBryde, the "orders" covered by the finality clause are those orders issued by the Judicial Council pursuant to § 372(c)(6); "determinations" refer to determinations by the judicial council that a subject judge's conduct might constitute grounds for impeachment or is not amenable to resolution by the judicial council, see § 372(c)(7)(B), or a determination by the Judicial Conference that consideration of impeachment is warranted, see § 372(c)(8). Taking this argument to its logical conclusion, the phrase "orders and determinations" would encompass only the Council's December 31, 1997 Order. All other aspects of the § 372(c) proceedings would be subject to review, including the findings contained in the Special Committee's Report and the Review Committee's September 18, 1998 Order.
Assuming that Judge McBryde is correct as a matter of statutory interpretation, his desired result  de novo review of the Special Committee's report  does not *158 necessarily follow. The Judicial Council's 1997 Order adopted "by a clear majority vote the Special Committee's Report, Findings of Fact, and Recommendations." Admittedly, the Council did so only "to the extent relevant to the action taken below," which qualification renders it impossible to discern the precise basis for the Order. But the fact remains that the finality clause leaves all aspects of the Order "final and conclusive." The Court cannot "question the wisdom" of the Special Committee's Report, as Judge McBryde urges, without questioning the wisdom of the Judicial Council's Order, which Judge McBryde concedes is not subject to judicial review. Judge McBryde's suggested approach would require the Court to revisit all of the testimony and all of the exhibits that were considered by the Special Committee during several weeks of hearings, adopted by a clear majority of the Judicial Council, and ultimately affirmed by the Review Committee. Needless to say, this course of action would completely eviscerate the finality clause. Even if Judge McBryde is correct that the phrase "orders and determinations" does not directly encompass the Special Committee's Report because it is neither an order nor a determination, the plain language of the statute renders the Special Committee's findings binding on this Court by virtue of the Judicial Council's unreviewable Order adopting those findings.
The few reported decisions construing the finality clause have done so in dicta, see, e.g., McBryde II, 120 F.3d at 520 n. 1 (noting in passing that any arguments "concerning dismissal of Judicial Conference proceedings should be directed to that body and not to this court"), or their continuing validity is called into question by subsequent decisions, see, e.g., Hastings, 593 F.Supp. at 1377-78 (affirmed in part and vacated in part by later Hastings decisions). Although this Court may not technically be bound by these decisions, the weight of the authority suggests that the finality clause should be interpreted broadly to preclude judicial review of all claims that do not rise to the level of constitutional challenges. In Judge Gesell's Hastings decision, for example, he examined the language of the clause, the legislative history, and various Supreme Court precedents, and concluded that Congress had intentionally established an "absolute bar against judges under inquiry seeking judicial review of actions taken against them pursuant to the Act." Hastings, 593 F.Supp. at 1378. In the same vein, the Fifth Circuit noted that "Congress has made crystal clear its intent that the federal courts as such exercise no appellate jurisdiction" over claims arising out of § 372(c)(10) proceedings. See McBryde I, 117 F.3d at 220 n. 7; see also McBryde II, 120 F.3d at 523 (finding that § 372(c)(10) "unambiguously forecloses judicial review" of the Judicial Conference's orders and determinations). But see Hastings I, 770 F.2d at 1109 (Edwards, J., concurring) (commenting that the scope of § 372(c)(10) is ambiguous). At the same time that they militate against judicial review, however, these cases also make clear that the finality clause is no bar to review of constitutional challenges to the Act. See Hastings, 593 F.Supp. at 1378 (holding that "the Act does not bar judicial review of the facial validity of the statute itself"); see also Hastings I, 770 F.2d at 1109 (Edwards, J., concurring) (raising questions about any interpretation of § 372(c)(10) that would bar constitutional claims); Hastings III, 829 F.2d at 108 n. 69 (on the question of whether the court could hear plaintiff's due process challenges to the Act as-applied, noting that "sensitive and unsettled questions of constitutional law would arise if the challenged actions are covered by the prohibition on judicial review"). On balance, the Court finds that the finality clause must be construed so as to bar Judge McBryde's statutory claims while preserving his right to challenge the constitutionality of the Act, both on its face and as it was applied to him by the Defendants.
*159 Notwithstanding the foregoing analysis, Judge McBryde maintains that the Court has jurisdiction to hear his non-constitutional claims to the extent that the Defendants exceeded their delegated powers or acted "contrary to a specific prohibition in the Act." Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Leedom v. Kyne considered the question of whether the district court had jurisdiction of an original suit to vacate an otherwise unreviewable determination made by the National Labor Relations Board, where there was no dispute that the Board's determination was made in excess of its statutory powers. See id., 358 U.S. at 185, 79 S.Ct. 180. The Court held that the district court did have jurisdiction to hear the suit, distinguishing between claims that the Board had acted in excess of its delegated powers or contrary to a specific prohibition in the National Labor Relations Act and suits to "review" a decision of the Board as such. See id. at 188, 79 S.Ct. 180. Because the Board had attempted to exercise a power that Congress had specifically withheld, the Court reasoned that the district court should have jurisdiction of an original suit in order to prevent deprivation of the plaintiffs' statutory rights. See id. at 189, 79 S.Ct. 180.
In Dart v. United States, 848 F.2d 217 (D.C.Cir.1988), this Circuit clarified that the Leedom v. Kyne exception is available only to review facial violations of a given statute. See Dart v. United States, 848 F.2d at 231. Like § 372(c)(10), the finality clause at issue in Dart provided that "[t]he order of the Secretary shall be final and is not subject to judicial review." 50 U.S.C. § 2412(c)(1) (Supp. III 1985). The plaintiff maintained that he was entitled to judicial review of the Secretary's decision despite the finality clause because the Secretary had exceeded his statutory authority. Without examining the underlying decision on its merits, the Dart court concluded that the contested order violated the relevant statute "on its face." Dart, 848 F.2d at 231. Dart cautioned, however, that the Leedom v. Kyne exception for review of facial violations must "remain narrow":
Congress' finality clause must be given effect, and an agency action allegedly "in excess of authority" must not simply involve a dispute over statutory interpretation or challenged findings of fact.... [T]he invocation of Leedom v. Kyne jurisdiction is extraordinary; to justify such jurisdiction, there must be a "specific provision of the Act which, although it is clear and mandatory, was nevertheless violated."
Dart, 848 F.2d at 231 (internal citations and quotations omitted). Mindful of the Supreme Court's admonition that courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers," Leedom v. Kyne, 358 U.S. at 190, 79 S.Ct. 180, this Court must consider whether Judge McBryde has demonstrated the sort of facial statutory violation contemplated by Dart.
Judge McBryde contends that the Defendants committed two such statutory violations. First, Judge McBryde charges that Committee imposed sanctions upon him that were improperly based on evidence not pertaining to any of the five official complaints before the Special Committee. Tr. at 56. Second, he claims that the Defendants exceeded the "jurisdictional mandate of the statute ... by reviewing Judge McBryde's decisions and punishing him for those decisions." Tr. at 55.

1. Expanded Scope of the Investigation
The section 372(c) proceedings found their genesis in a series of five complaints concerning Judge McBryde. Of the five complaints, four were identified by Chief Judge Politz. See 28 U.S.C. § 372(c)(1) (authorizing the chief judge to "identify" a complaint in lieu of a written complaint filed with the clerk of the court of appeals). Chief Judge Politz established *160 the Special Committee to investigate these complaints, see id. § 372(c)(4)(A) (appointment of the special committee by the chief judge), and the Special Committee elected to expand the scope of the investigation into broader areas of concern suggested by the five complaints, see id. § 372(c)(5) (permissible scope of the special committee's investigation). Judge McBryde maintains that the Council's sanctions and public reprimand arose out of this "unbridled investigation," rather than out of a finding that any of the five complaints was meritorious. See Pl.'s Stmt. at 39. As Judge McBryde views it, these deficiencies render the entire process flawed.
The problem with Judge McBryde's argument is that the Act contains no such limitations on the Special Committee's power to expand the scope of the investigation, nor does it mandate that the Judicial Council's remedial actions be based on a meritorious complaint. Section 372(c)(4)(A) clearly empowers the special committee to "conduct an investigation as extensive as it considers necessary." 28 U.S.C. § 372(c)(4)(A).[15] The report that the special committee prepares must include the "findings of the investigation" and "recommendations for appropriate and necessary action by the judicial council of the circuit," but "findings on the complaint" are not a prerequisite to judicial council action under § 372(c)(6). See id. §§ 372(c)(5), (c)(6). In addition, the Act specifically authorizes the Chief Judge to "identify" a complaint. See id. § 372(c)(1). Neither the identification of the complaints nor the expanded scope of the investigation were clearly in excess of the Defendants' statutory authority, therefore they cannot be used to invoke Leedom v. Kyne jurisdiction. See Dart, 848 F.2d at 231.

2. "Merits-Relatedness"
Judge McBryde's contention that the Defendants reviewed the merits of his judicial decisions and punished him for disagreement with his judicial philosophy recurs throughout his complaint. In the context of his as-applied separation of powers claims, this theory supports his argument that the Defendants impermissibly exercised Article III powers, as well as his assertion that the proceedings compromised his judicial independence. His statutory claims are also predicated on this characterization of the Judicial Council's order. As a matter of immediate concern, the Court must assess the availability of Leedom v. Kyne jurisdiction to review Judge McBryde's non-constitutional claims, but the answer to this question will also substantially shape the Court's approach to Judge McBryde's remaining claims. The threshold inquiry is whether the scope of the Defendants' investigation and the basis for the remedial measures they imposed on Judge McBryde crossed the line into the protected sphere of judicial decision-making. If so, the Court must determine whether this transgression violates a clear and mandatory provision of the Act.
The vast majority of the evidence presented to the Special Committee consisted of testimony pertaining to how Judge McBryde behaves when he conducts trials and other proceedings, and how Judge McBryde interacts, both formally and informally, with attorneys, judges, and other courthouse personnel. The Special Committee digested this evidence and determined that the reported incidents "bespeak several alarming patterns of conduct exhibited by Judge McBryde over the course of his tenure on the bench." Special Committee Report at 124. Five broad tendencies emerged, all of which combined to paint Judge McBryde as a jurist plagued by intemperance, abusiveness, and a profound lack of collegiality. On the *161 strength of the Special Committee's Report, Findings of Fact, and Recommendations, which the Council adopted "[t]o the extent relevant below," the Council issued its 1997 Order and Public Reprimand. See 1997 Order.
When Judge McBryde petitioned the Review Committee for relief from the Judicial Council's Order, one of the central themes of his petition was that essentially all of the conduct for which the Council had sanctioned him directly related to the merits of a decision or procedural ruling. See Review Committee's 1998 Order at 15. Judge McBryde argued to the Review Committee, as he argued to the Special Committee and as he argues in the case at bar, that a judge cannot be sanctioned for a pattern of allegedly improper rulings any more than he or she can be sanctioned for a single allegedly improper ruling. While affirming Judge McBryde's basic position that it would not be permissible to sanction a judge based on disagreement with the merits of his rulings, both the Special Committee and the Review Committee soundly rejected Judge McBryde's contention that the Special Committee and the Judicial Council had violated this rule. The Review Committee reasoned as follows:
Although a judge indeed may not be sanctioned out of disagreement with the merits of his rulings, a judge certainly may be sanctioned for a consistent pattern of abuse of lawyers appearing before him. The fact that that abuse is largely evidenced by the judge's rulings, statements, and conduct on the bench does not shield the abuse from investigation under the Act.... To say that abuse of lawyers, or other forms of misconduct, that finds expression in a judge's rulings may be remedied under the Act is not to say that a judge's rulings themselves may be challenged under the Act.
Id. (emphasis in original); see also In re Complaint, 37 F.3d at 1515 (finding that "the central thrust of the Act is to make judges accountable for precisely this sort of conduct: conduct not related to the merits of rulings that arises in the course of the performance of judicial duties"). Distinguishing the complaints against Judge McBryde from numerous other complaints that were packaged as conduct-related but dismissed as merits-related, the Review Committee found that "the claims of improper conduct were supported by considerable substance" evidencing judicial intemperance and abusive behavior. Review Committee Order at 17.
The Review Committee's analysis reflects deep respect for the important distinction between the merits of a judicial decision and the conduct of the judge rendering that decision. Although the line between merits and conduct is "not always easily found," McBryde I, 117 F.3d at 230, courts have been able to draw a meaningful distinction between legal or factual determinations, on the one hand, and a judge's courtroom demeanor, on the other hand. In McBryde I, for example, the Fifth Circuit concluded that the Judicial Council had ventured into forbidden territory by removing two cases from Judge McBryde's docket after he made certain controversial credibility determinations. See id. (citing United States v. Washington, 98 F.3d 1159, 1165 n. 1 (9th Cir.1996) (stressing that the judicial council cannot address matters that might be raised through normal channels of appellate review)). Although the Judicial Council ostensibly acted to remedy "judicial misconduct," the Fifth Circuit found that the Judicial Council had in fact sanctioned Judge McBryde based on the merits of his decisions. The court noted, however, that a different outcome might result if there were "`any indication of a broader pattern of conduct evidencing incapacity, arbitrariness, or neglect of office.'" Id. at 230 (quoting In re Charge of Judicial Misconduct, 613 F.2d 768, 769 (9th Cir.1980)).
The Judicial Conference of the United States has recognized that its own limited jurisdiction excludes specifically legal or *162 constitutional questions. See In re Complaint of Jud. Misconduct, No. 84-372-001, Jud. Conf. of the U.S., at 6 (stating that "[w]e have no competence to adjudicate the facial constitutionality of the statute or its constitutional application to the speech of the accused judge .... We are not a court."). On numerous occasions, circuit judicial councils have dismissed complaints which essentially challenge the merits of judicial rulings. For instance, the First Circuit Judicial Council dismissed a complaint alleging misconduct on the part of a judge on the grounds that it "directly related to the merits of decisions or procedural rulings of the judge complained against." In re Complaint No. 157 at 2, Aug. 4, 1994 (citing 28 U.S.C. § 372(c)(3)(A)(ii)). In that instance, unlike those that emerged out of the investigation into Judge McBryde's behavior, the complaint suggested that the judge harbored improper animus against the complainant without providing any "factual support whatsoever, beyond the allegedly erroneous rulings themselves, to suggest that the judge may have acted with any improper motivation." Id. Similarly, when an attorney filed a section 372(c) complaint against a district court judge protesting that the judge had issued an erroneous judgment holding the complainant personally liable for a large sum of money as reimbursement for attorneys fees, the First Circuit Judicial Council dismissed the complaint. See In re Complaint No. 159, Sept. 7, 1994, at 4. Although conceding that the judgment was indeed erroneous, the Judicial Council wrote that "Complainant's proper recourse to challenge these rulings was by way of motion in the district court and, if necessary, appeal to the court of appeals, not by way of a complaint of judicial misconduct under § 372(c)." The Judicial Council recognized that it lacked jurisdiction over a complaint "directly related to the merits of decisions or procedural rulings." Id. at 2.
Dismissing one complaint, the Fourth Circuit Judicial Council noted that "[i]t is not proper to utilize the Act if other suitable judicial remedies are available ...." That Judicial Council again dismissed a complaint that sought the recusal of a judge from a particular case. The complainant based the request for recusal on a colloquy between the judge and counsel in which the judge "challenged the strength of the positions articulated by complainant. ..," and a later settlement discussion in which the judge used strong language to express doubt about complainant's assessment of the damages potential of his claim. See In re Complaint No. 121, Mar. 12, 1993. The Council emphasized that a judge "is accorded wide latitude to comment on a case in colloquy with counsel and the parties in managing the pursuit of litigation." Id. at 2. Mere comments that appear to challenge the merits of a claim or its monetary value do not rise to the level of judicial misconduct as contemplated by the Act.
Just as a body constituted under section 372(c) is not the appropriate forum to review the merits of decisions or procedural rulings, a court of appeals is not the appropriate forum to monitor and redress a judge's broad course of conduct consisting of abusive and intemperate behavior, unless it affects the merits in a given case. For example, the Fifth Circuit Court of Appeals reviewed the legal disposition of several cases in which Judge McBryde conducted himself so offensively that his actions ultimately came before the Special Committee. See, e.g., Dawson v. United States, 68 F.3d at 886; Van Waeyenberghe, 990 F.2d at 845. Although both the Dawson and the Van Waeyenberghe courts remarked upon certain aspects of Judge McBryde's conduct, these remarks remained peripheral to the opinions and finally irrelevant to the legal resolution of the cases. Additionally, while a court of appeals may review a lower court's legal conclusions and a given judge's conduct in isolated instances, a judicial council is able to examine a judge's course of conduct as it ranges over many interactions.
*163 Therefore, contrary to Judge McBryde's assertion, appellate review is not always an adequate means of addressing this problem. Consider the interaction between judge and attorney: A judge's treatment of an attorney may not affect the outcome of a particular case or pending motion, thereby insulating it from review, and yet have a profound effect on the efficacy of the attorney's representation. The Special Committee heard evidence that Judge McBryde's courtroom conduct prevented some attorneys from building a record that would preserve their client's rights on appeal. In a smaller legal community, the impact of such intangible conduct is magnified, and yet the court of appeals can only rectify those instances that rise to the level of reversible error in a specific case. When the appellate court considered the merits of Judge McBryde's decisions, apart from an occasional remark about Judge McBryde's manner of dealing with the issue or attorney at hand, the court did not address a course of conduct involving multiple instances over many cases in which Judge McBryde's behavior reflected an abusive pattern.
Upon review of the Special Committee's Report, the Court finds that the Judicial Council did not repeat the mistakes that it made in McBryde I. Based on extensive testimony from witnesses regarding their experiences with Judge McBryde, the Special Committee identified certain patterns of conduct that prevented attorneys from zealously representing their clients. Rather than focusing on any one isolated event, the Special Committee examined a series of incidents and found, based on the totality of the circumstances, that Judge McBryde's conduct was having a deleterious effect on the entire legal community. See Report at 49-50. Significantly, there is no indication on the record that the Defendants or witnesses were motivated by ideological or political differences with Judge McBryde; the witnesses represented the entire legal community, including public defenders, prosecutors, private practitioners, and fellow jurists, and the conduct under scrutiny is not susceptible of any political categorization. Admittedly, some of the incidents that witnesses described were more egregious than others. Indeed some of the testimony was favorable to Judge McBryde. But looking at the Special Committee's conclusions on their face, see Dart, (emphasizing that the Court is not to engage in factual disputes or matters of statutory application), the Court perceives no question that these conclusions emerged out of the Special Committee's assessment that the overall impact of Judge McBryde's conduct had far-reaching consequences that extended beyond the legal community to the general public.[16] As a result, Leedom v. Kyne *164 does not provide a basis for overriding the clear dictate of the finality clause.

3. The Non-Constitutional Claims
Judge McBryde's non-constitutional claims can be briefly summarized as follows. As described above, Judge McBryde claims that the Judicial Council exceeded its jurisdiction by reviewing the merits of his judicial decisions and procedural rulings, and by taking remedial actions based on the expanded investigation rather than the original five complaints (Count V). In support of his request for a writ of mandamus (Count VII), Judge McBryde argues that all five of the official complaints should have been dismissed because they were outside the scope of the Judicial Council's jurisdiction and unsupported by the evidence. Judge McBryde's primary argument that the Judicial Council violated the Act and the Complaint Rules (Count IV) essentially replicates his arguments in favor of mandamus and that the Judicial Council exceeded its jurisdiction: he contends that the complaints and the factual basis for the orders were merits-related, and that the Special Committee's findings do not support the Judicial Council's conclusion that Judge McBryde's conduct is prejudicial to the effective and expeditious administration of justice.[17] Based on the foregoing analysis of the finality clause, however, all three of these claims must be dismissed for lack of subject matter jurisdiction.

C. As-Applied Constitutional Claims
Having determined that the finality clause bars review of Judge McBryde's non-constitutional claims, the Court turns next to the as-applied constitutional claims. These include the remaining portion of Judge McBryde's separation of powers claims (Counts I, II and III) and his denial of due process claim (Count VI). To some extent, these claims are coextensive with issues that have already been addressed or issues that are precluded by the finality clause. As for the remainder of Judge McBryde's as-applied claims, the Court finds that, with the exception of his First Amendment Claim, they are without merit.

1. Separation of Powers
The main thrust of Judge McBryde's claim that the Act is unconstitutional as it was applied to him is that "[h]e has been punished, and his judicial status has been altered, because of disagreements with the merits of his rulings and decisions ... [and] he has been subjected to a `temporary impeachment.'" Pl.'s Stmt. at 5 (quoting United States v. Avilez-Reyes, 160 F.3d 258, 262 (5th Cir. 1998) (Jones, J., dissenting)). Because the Court has already declined to adopt Judge McBryde's characterization of the Special Committee's Report, see supra II.B.2, there is no need to revisit his contention that the Defendants unconstitutionally interfered *165 with his judicial independence by punishing him based on disagreements with his judicial philosophy or the merits of his rulings. Furthermore, Judge McBryde was not technically removed from office; his salary was not diminished, his judicial powers remain intact, and he has continued to decide cases and controversies. Thus, a constitutional violation will lie only if the remedial sanctions effectively removed Judge McBryde from office or significantly diminished his judicial independence.
Judge McBryde's public reprimand did not effect a removal from office, nor did it interfere with the protected sphere of judicial decision-making. Judges, like other public officials, frequently become targets of public criticism for their actions. Although the spirit of collegiality tends to shield judges from criticism from within the Judicial Branch, such criticism is not unheard of and has never been thought to create a problem of constitutional dimensions. Certainly, the public reprimand carried the added sting of the Judicial Council's imprimatur, but the Court sees no reason why the official stamp of the Judicial Council renders the reprimand unconstitutional.
Unlike the public reprimand, the assignment order and the disqualification order had a direct impact on Judge McBryde's docket. The assignment order interrupted the usual stream of new cases for a period of one year, and the disqualification order prevents Judge McBryde from participating for a period of three years in any cases involving attorneys who took part as witnesses or prospective witnesses in the Special Committee's hearings. These measures are certainly more tangible, but their impact still does not approximate removal. Judge McBryde's caseload plummeted over the course of the year as a result of the assignment order, but neither his existing docket nor his power to manage it as he saw fit was impaired.[18] The disqualification order had a somewhat further reach,[19] but that order was both necessary and appropriate given the risk that Judge McBryde might engage in retaliation against witnesses and others. Both aspects of the Judicial Council's order were limited in scope, and tailored to the problem at hand. The Court is persuaded by the Defendants' arguments that all three aspects of the Judicial Council's order were constitutional.

2. Due Process
Judge McBryde enumerates a series of due process violations that purportedly infected each stage of the proceedings against him. The Court shall consider these alleged infringements of his due process rights by organizing them into three categories: (1) procedural irregularities; (2) structural defects; and (3) improper motives. Under the first category, he contends that the Special Committee engaged in "an illegal investigation" by broadening its review of Judge McBryde's activities beyond the purview of existing complaints against him. See Pl.'s Mot. Summ. J. at 98-99 ("[C]ounsel for the Special Committee combed the Fort Worth legal community for ammunition to further the goal of reviewing Judge McBryde's entire judicial career."). Moreover, Judge McBryde alleges that he was denied adequate notice, having received the Special Committee's 159-page report a mere twelve days before the Judicial Council's December 17 meeting, and that he was the victim of a "rush to judgment" on the Judicial Council's part. In both of these respects, he maintains, he suffered a violation of his due *166 process rights. See id. at 99-101. Finally, Judge McBryde complains that the Special Committee and the Judicial Council deprived him of his constitutionally mandated right to a fair hearing by permitting, and then predicating judgment upon, hearsay testimony, gossip, polls, rumor, and "local knowledge." See id. at 105-08.
In addition, Judge McBryde argues that certain structural defects in the division of labor between the various entities constituted to investigate, adjudicate, and review the merits of the complaints against him amounted to an unconstitutional deprivation of due process. Under this rubric, Judge McBryde points to the deference accorded by the Judicial Council to the Special Committee's findings, and in turn the deference accorded by the Review Committee to the Judicial Council's judgment. See id. at 101-05. ("The Review Committee deferred to the judgment of the Council, which had deferred to the Report of the Committee. No entity with authorization under the Act to decide Judge McBryde's fate made a reasoned decision."). In a related vein, Judge McBryde asserts that the proceedings, particularly the dual service of four Special Committee members as participants in the Judicial Council, applied the Act impermissibly to combine investigative and adjudicative functions. See id. at 114-16.
Finally, Judge McBryde impugns the motives of several judges who served on the various bodies involved in the proceedings. He maintains, as an initial matter, that the actions taken against him issued out of a retaliatory motive, and thus were riddled with vindictiveness. See id. at 110-14. Judge McBryde also levels the quite serious charge that bias and prejudice on the part of the investigating and adjudicating officials poisoned the proceedings against him, thereby depriving him of an impartial tribunal. See id. at 108-10.
Both Defendants and the United States have argued that, because he raised most of these allegations in great detail and at great length before the Review Committee of the Judicial Conference, and because the Review Committee dismissed them in its September 18, 1998 Order, Judge McBryde is effectively precluded from raising issues relating to alleged procedural errors and unfairness in the context of the Special Committee hearings and the Judicial Council's judgment. See, e.g., Def.'s Mem. Opp. Pl.'s Mot. Summ. J. at 21. Defendants have maintained throughout this action that the finality clause deprives this Court of jurisdiction over many of the grievances Judge McBryde has raised regarding the investigatory and, ultimately, disciplinary process he endured in response to complaints about his abusive behavior. If, as Defendants maintain, section 372(c)(10) prohibits this Court from hearing the allegations that Judge McBryde presented to the Review Committee, albeit in a different form, then for the Court to render a decision with respect to any of these allegations would be for the Court to transgress its Article III function by issuing an advisory opinion. See U.S. Const. Art. III § 2 (conferring jurisdiction over cases and controversies).
At the motions hearing, however, counsel for Defendants conceded that "Judge McBryde can make an as-applied constitutional challenge, but he has to make it in the context of the findings of the special committee and the council as affirmed by the review committee." Tr. at 50. This rather circular logic promises to yield absurd results. If the Court found this logic persuasive, it would retain jurisdiction over Judge McBryde's claims only to the extent they do not conflict with either the findings of the Special Committee and Judicial Council, or the reasoning of the Review Committee. In effect, Judge McBryde would be precluded from raising his due process challenges with respect to all claims that received attention at those earlier stages; yet Judge McBryde wishes precisely to challenge aspects of those earlier proceedings on constitutional grounds. While Judge McBryde raised numerous allegations of procedural unfairness and *167 violations of both the Act and the Fifth Circuit Complaint Rules before the Review Committee,[20] these did not expressly implicate constitutionally mandated rights. As the Court concluded above in its discussion of the finality clause, Judge McBryde may bring his claims challenging the constitutionality of the Act both on its face and as applied to him, including those alleging procedural flaws of constitutional magnitude. See supra section B.
The Court is mindful that, as the Supreme Court wrote over three decades ago, "[d]ue process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise." In re Gault, 387 U.S. 1, 19-20, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The rules that govern adversarial proceedings are the "instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data. `Procedure is to law what "scientific method" is to science.'" Id. at 21, 88 S.Ct. 55. Time and again the Supreme Court has emphasized that, at minimum, the Due Process Clause requires notice and an opportunity to be heard. See, e.g., Cleveland Bd. of Ed. v. Loudermill et al., 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (enunciating basic requirements where individual stands to be deprived of significant property interest, here public employment); Morrissey et al. v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (listing the minimum due process requirements for parole revocation, to wit: (1) written notice of the claimed parole violations; (2) disclosure of the evidence against the parolee; (3) opportunity to be heard and to present witnesses and evidence; (4) right to confront and to cross-examine adverse witnesses; (5) a "neutral and detached" hearing body; (6) and a written statement by the factfinders documenting evidence relied on and their reasoning); In re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (construing state disbarment proceedings as "adversary proceedings of a quasi-criminal nature," and therefore as requiring notice and an opportunity to be heard). As these and other Supreme Court cases make evident, "due process is flexible and calls for such procedural protections as the particular situation demands. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for some kind of procedure." Morrissey, 408 U.S. at 481, 92 S.Ct. 2593.
According to these precedents, then, Judge McBryde was undeniably afforded the most basic elements of due process. Thus, while the Supreme Court has on numerous occasions and in a variety of contexts enunciated minimum standards of constitutionally required due process, such discussions offer this Court no yardstick by which to measure, for example, precisely how much notice or how extensive an opportunity to be heard someone in Judge McBryde's position merits. Nor, for that matter, do the parties offer the Court any basis upon which to draw finer distinctions with respect to Judge McBryde's exact entitlements or the absence thereof. Accordingly, the Court shall evaluate each of Judge McBryde's due process claims with an eye toward all of the circumstances surrounding the investigation and adjudication of the complaints against him.

a. Procedural Irregularities
In arguing that the Special Committee conducted an "illegal investigation" by *168 broadening its scope beyond the specific incidents alleged in the five original complaints, Judge McBryde essentially dresses up a rules violation claim as a deprivation of constitutional due process. Although his counsel objected to the Special Committee's "roving" investigation, the Special Committee continued to gather witnesses and incidents that established a pattern of conduct on Judge McBryde's part in anticipation of its upcoming hearings. See Pl.'s Mot. Summ. J. at 98-99; see also September 18, 1998 Order at 7-10. Judge McBryde points to no specific procedural rights of which this expansion deprived him, but rather characterizes it rather generically as "illegal." Assuming that an expansion of its investigation would be illegal, however, it ran contrary not to constitutional guarantees but rather to the mandates of section 372(c)(5) and Rule 9(A) of the Fifth Circuit Complaint Rules. While this expansion was not in itself a due process violation, the Court has also determined above in Section B that the Special Committee did not exceed its statutory authority.
In this regard, only Judge McBryde's claim that he received inadequate notice of this expansion, along with the additional charges and witnesses it entailed, implicates constitutional guarantees of due process. While this Court is not bound by the Review Committee's determinations with respect to Judge McBryde's constitutional claims, the Court finds the Review Committee's analysis of this issue persuasive. Although the notice Judge McBryde received regarding the precise contours of the investigation as it expanded might ideally have included more detail, Judge McBryde was neither prejudiced in preparing for the hearing, nor deprived of the essential information he needed to do so. See Order of September 18, 1998 at 11 ("The letters sent by the special committee's counsel gave plain notice of the subject matter to be investigated."). In response to the new charges this expansion precipitated, Judge McBryde was afforded additional time to prepare. See id.
Inadequate notice also inspires Judge McBryde's complaint with respect to the Judicial Council's December 17, 1997 meeting and its December 31, 1997 Order. After being served with the Special Committee's 159-page final Report on December 4, Judge McBryde enjoyed less than two weeks to prepare his response thereto in time for the Judicial Council to consider it in advance of the meeting. See Pl.'s Mot. Summ. J. at 99. Nonetheless, and "[t]hrough great effort and expense," id. at 100, Judge McBryde managed to prepare several extensive responses. The Court cannot say that this interval, abbreviated as it may have seemed to Judge McBryde, deprived Judge McBryde of notice so as to violate his due process rights. Nor can the Court say that the period of time during which members of the Judicial Council considered his responses prior to their meeting, or the two weeks during which they reviewed additional responses from Judge McBryde before issuing their December 31 Order, is so brief that it amounts to a "rush to judgment" by the Council in violation of constitutionally mandated due process. Id. at 99-101. As this Court remarked in the context of Judge McBryde's requests to conduct discovery on the process by which the Judicial Council reached its final decision, his "rush to judgment" theory is predicated on certain unsupported assumptions about the appropriate amount of time a decisionmaker should devote to arriving at its decision. See Memorandum Op. of Sept. 30, 1999 at 4. No constitutional rights are necessarily at stake in a purported deviation from his ideal standard.
Finally, an alleged due process violation animates Judge McBryde's claims that the Special Committee, and accordingly the Judicial Council, relied on hearsay and other impermissible evidence in making its findings of fact. Thus, Judge McBryde maintains, he remained unable to confront witnesses and evidence against *169 him. See id. at 105. For example, the Special Committee's allusion to "the reluctance of witnesses to come forward and to testify in these proceedings because they fear reprisal," a reluctance that, in some cases, necessarily escaped documentation in the record, appears to present evidence which Judge McBryde was unable to confront. Still, the Court is persuaded that such evidence did not dictate nor even shape the Special Committee's ultimate findings, or the Judicial Council's decision. Instead, the Special Committee relied upon twenty discrete, and amply documented, incidents in rendering its determinations about Judge McBryde's intemperate and abusive behavior. Remarks such as the one quoted above may bolster the conclusion that Judge McBryde's conduct impacted the Fort Worth legal community in significant ways, but they are in no sense necessary to that conclusion; rather, the parade of witnesses and reams of documentary evidence fully demonstrate that Judge McBryde inspired fear and intimidation in many attorneys who appeared before him. Accordingly, the Court finds that the hearsay, gossip, and other forms of evidence that may have contributed to the Special Committee's findings remained so ancillary to the bulk of the evidence upon which the Special Committee relied as not to present any potential due process violation.

b. Structural Defects
Further, Judge McBryde contends that, by improperly conflating investigative and adjudicative functions, the Judicial Council violated his due process rights. He argues specifically that the deference which the Judicial Council granted to the Special Committee's findings and recommendations effectively transferred the adjudicative function from the former to the latter. As a consequence, the Special Committee operated not just as an investigative body, but as a "prosecutorial-investigative-adjudicative body." Pl.'s Opp. to United States' Mot. Dismiss at 15.[21] In addition, Judge McBryde maintains, four members of the Special Committee who participated in the investigation of the complaints against him subsequently participated in the Judicial Council's adjudication of those complaints. See Pl.'s Mem. Supp. Mot. Summ. J. at 114.
In the words of the Supreme Court, however,
[t]he contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. *170 Withrow et al. v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Similar claims "have been squarely rejected in prior decisions of [that] Court." Id. The Withrow plaintiff, a licensed physician whose practice consisted of performing abortions, faced suspension of his license by a state medical examining board which conducted its own investigation. See id. at 38-41, 95 S.Ct. 1456. He sought to enjoin the board from deciding the issue of suspension, arguing that such a combination of functions violated guarantees of due process, see id. at 42, 95 S.Ct. 1456, but the Supreme Court disagreed. Rejecting his challenge, the Court concluded that, absent specific evidence of bias, "the mere exposure to evidence presented in nonadversary investigative proceedings is insufficient ... to impugn the fairness of the Board members at a later adversary hearing." Id. at 55, 95 S.Ct. 1456.
Accordingly, while "we should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice...," id. at 54, 95 S.Ct. 1456, the dual service of Committee members as Council members, and the practice of deferring to the extensive, and painstaking, fact finding of the investigative body, "do not in themselves contain an unacceptable risk of bias." Id. In Hastings v. Judicial Conf. of the United States, 829 F.2d 91 (D.C.Cir.1987), cert. denied, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988) ("Hastings III"), the District of Columbia Circuit considered precisely this question in the context of a facial attack on the Act. Quoting the Supreme Court's language in Withrow, the Hastings III Court held that no risk of bias emanating from the overlap of adjudicative and investigative functions inhered in the Act. Id. at 105. In the most eloquent and emphatic terms, the Court wrote:
The fact that federal judges administer the mechanism described by the Act contributes in no small measure to this conclusion. They are called upon every day to put aside considerations not legally relevant to their decisions. A judge who can decide a case one way, notwithstanding inadmissible evidence of which he is aware indicating a different result, is not likely to prejudge a fellow judge's cause. If there is a risk here, it is the risk that an empathetic decision-maker poses to the public, not a risk of bias toward the judge against whom a complaint has been lodged.
Id. Indeed, Judge McBryde has adduced no evidence to suggest that this overlap of functions, either via the deference the Judicial Council may have accorded the Special Committee, or via the dual service of certain judges, operated here to deprive him of due process.

c. Improper Motives
While these structural aspects of the proceedings may not in themselves have deprived Judge McBryde of his constitutionally guaranteed due process, he also maintains that specific judges who served in investigative and adjudicative capacities harbored illegitimate motives against him. In particular, he contends that Chief Judge Politz's putative threat (warning him that his entire judicial career would be explored if he sought assistance from the Judicial Council in response to the Satz and Torres disputes, see Pl.'s 108(h) ¶ 16) heralded a process motivated by vengeance and bias. According to Judge McBryde, several of the judges involved in the investigation endeavored to retaliate against him both for his refusal to undergo a psychiatric evaluation, and for his ultimate triumph in persuading the Fifth Circuit to vacate Chief Judge Buchmeyer's reassignment orders. See generally Pl.'s Mot. Summ. J. at 108-14.
Judge McBryde raised these contentions both before the Judicial Council and before the Review Committee. He moved for the recusal of several judges from the Special Committee and the Judicial Council; the final such motion occurred before the December 17, 1998 meeting of the Judicial Council. There the named judges declined to recuse, but subsequently withdrew from *171 the meeting while the remaining members discussed and reviewed the motion. In the absence of their fellow judges, the remaining members of the Judicial Council denied Judge McBryde's motion for recusal of the judges he identified. See Def.'s Mot. to Dismiss or for Summ. J. at 60-61. As Defendants have persuasively characterized Judge McBryde's ongoing claim of bias following this practice,
the unstated but necessary predicate for Judge McBryde's position is that all fourteen members of the Judicial Council not accused by Judge McBryde of bias and all five members of the Review Committee (each an Article III judge even if serving in an administrative capacity) were either `tainted' or so `cowed' by the `biased' judges as to have been unable to think or to act independently on the basis of the record.
Def.'s Opp. to Pl.'s Mot. Summ. J. at 26. The Court finds such a position utterly implausible. Cases in which "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally desirable" include "those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." Withrow, 421 U.S. at 47, 95 S.Ct. 1456 (citations omitted). Judge McBryde has presented no such circumstances to impute bias to these or other participants in the challenged process. Instead, he offers mere conclusory allegations of bias and vindictiveness that are effectively barred under Withrow. See id.

D. Judge McBryde's First Amendment Claim.
Finally, Judge McBryde has alleged that the Act's confidentiality clause violates the First Amendment, both facially and as it has been applied to him. Section 372(c)(14) provides in relevant part that
all papers, documents, and records of proceedings related to investigations conducted under this subsection shall be confidential and shall not be disclosed by any person in any proceeding except to the extent that 
(C) such disclosure is authorized in writing by the judge or magistrate who is the subject of the complaint and by the chief judge of the circuit, the Chief Justice, or the chairman of the standing committee established under section 331 of this title.
28 U.S.C. § 372(c)(14). Since the issuance of the Review Committee's Order, Judge McBryde has sought to make public the entire record of these proceedings. In his view, the imperatives of confidentiality that have protected this record from disclosure have "precluded him from defending himself in public against the accusations made by the Council and the Review Committee ...." Pl.'s 108(h) ¶ 199.

1. Events Relating to this Claim
When Judge McBryde filed his complaint in this Court, he had, per section 372(c)(14), tendered requests to both Chief Judge Politz and Judge Bauer to release the record in full. Both judges refused to accede to what they characterized as Judge McBryde's "all or nothing" request. See Defs.' letter to C.J. Rehnquist, Nov. 23, 1998 at 3 (Pl.'s Ex. 185). Both judges were willing to release a majority of the record with certain exceptions, including the psychiatric materials and witness identities. Judge McBryde had not yet availed himself of the third option which the statute provides for such a situation: petitioning Chief Justice William Rehnquist. Judge McBryde feared that to involve Chief Justice Rehnquist risked the possibility that, should his response become a subject of this lawsuit, the Chief Justice would be obliged to recuse himself from any consideration that the Supreme Court might later afford this case. See Compl. ¶ 97.
Since the filing of this case, the contours of Judge McBryde's First Amendment claim have shifted significantly. In November of 1998, Judge McBryde did petition *172 the Chief Justice, via letter, to permit him to disclose the entire record. While the parties awaited a response from Chief Justice Rehnquist, both Defendants and the United States maintained that Judge McBryde's First Amendment claim was not yet ripe for adjudication in this Court; after all, it remained possible that the Chief Justice would endorse his view that full disclosure of all the proceedings was now warranted. Accordingly, by agreement with the parties, the Court entered a protective order requiring the parties to redact their public filings in accordance with section 372(c)(14), and stipulated that the record would be unsealed if Judge McBryde obtained the requisite authorization, or if he prevailed on his First Amendment claim. Thus when Judge McBryde filed with this Court all the documents relating to the section 372(c) proceedings, the Court placed these under seal as well.
On June 11, 1999, the same day that the Court had scheduled oral argument on the dispositive motions in this case, Judge McBryde filed an additional motion to unseal the entire record along with a declaration from his attorney testifying to the hardship which the confidentiality requirement imposed on him and his client. See Pl.'s Mot. to Unseal Documents; Broiles Decl. ¶ 6. While earlier Judge McBryde had adduced arguments relating to the facial invalidity of the confidentiality provision, and the extent to which its application in his case had prevented him from engaging in the full and open discussions to which he aspired, his motion to unseal undertook a new line of analysis. There he argued that, both facially and as applied to him, section 372(c)(14) constituted a prior restraint on his ability to speak freely. See Pl.'s Mot. to Unseal Documents at 2-3 (citing, inter alia, City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); Kamasinski v. Jud. Rev. Council, 44 F.3d 106, 112 (2d Cir.1994)). Three days later, before the Court had the opportunity to consider Judge McBryde's latest motion, Chief Justice Rehnquist replied to Judge McBryde's request authorizing disclosure of all portions of the record save "the identity of the witnesses in the proceedings." C.J. Rehnquist letter of June 11, 1999 (Pl.'s Ex. 189). As justification for this remaining prohibition on disclosure, the Chief Justice cited Rule 15(G) of the Fifth Circuit Complaints Rules: "In any disclosure, the chief judge may for good cause require the shielding of identity of the complainant, or of any witnesses in an investigation conducted by special committee or the judicial council or in a limited inquiry conducted by the chief judge." Fifth Cir. Compl Rules 15(G). In the Chief Justice's words, "[t]he rule is designed in part to encourage potential complainants and witnesses to participate in judicial misconduct cases, and its application in this proceeding appears reasonable and should not prejudice any substantive arguments [Judge McBryde] may make about the record." C.J. Rehnquist letter at 1.
When filing this letter with the Court, Judge McBryde indicated in an attached affidavit that the Chief Justice's authorization did permit him to make some of the disclosures he "considered essential to be made for the public to have an understanding of the nature of the proceedings that were conducted against [him] and the magnitude of the improprieties in which participants in the proceedings have engaged ...." Nonetheless, he felt that, pace Rehnquist's assurance to the contrary, the remaining ban against disclosing witnesses' identities significantly prejudiced his ability to discuss, fully and frankly, the "nature of the proceedings" to which he had been subjected. See June 16, 1999 McBryde Decl. at 2-3. This Court ultimately denied Judge McBryde's motion to unseal on the grounds that the sealed portions of the record are riddled with references to the identity of the witnesses, and it was therefore impossible to unseal those portions of the record that were filed under seal without violating the terms of the Chief Justice's limited authorization. See *173 Amended Protective Order, filed Sept. 30, 1999.
Chief Justice Rehnquist's qualification with respect to "the identity of the witnesses in the proceedings" has occasioned some confusion among the parties. This reference to "the identity of the witnesses" leaves uncertain the scope of the precise information protected from disclosure. For instance, Judge McBryde contends that "virtually every one of the fifty-five witnesses to which the Chief Justice referred could be identified by the testimony he or she gave even if the names were deleted." Pl.'s Reply to Defs.' Supp. Response at 4-5. He points out that efforts to safeguard witnesses' names will necessarily confront the extent to which other contextual information relating to these witnesses will lead ineluctably to the discovery of their identities. Defendants, however, have maintained that "if Judge McBryde wishes to disclose the record, he must redact the names of witnesses ...." Defs.' Mem. in Response to Pl.'s Mot. Unseal at 4 (emphasis added). The Court resolved this ambiguity by determining, in its Amended Protective Order, that Chief Justice Rehnquist's letter prohibits disclosure only of the names of the witnesses in the section 372(c) proceedings. See Amended Protective Order at 3. More recently, the Court also ordered that the parties respond more directly to Judge McBryde's arguments in light of the new status quo following the Chief Justice's limited authorization. See Order of Nov. 18, 1999.

2. Judge McBryde's Argument.
According to Judge McBryde, the ambiguity surrounding the scope of the Chief Justice's prohibition exemplifies the unconstitutionality of section 372(c)(14). This provision, he contends, granted three government officials, and ultimately the Chief Justice, unbridled discretion to decide whether and within what content-based parameters Judge McBryde may speak.[22]See Pl.'s Omnibus Reply to Defs.' and United States' Opp. to Mot. to Unseal at 8-9. It is, he claims, "a classic prior restraint disguised as a licensing scheme; that is, before he may speak on core political issues, Judge McBryde first has to ask permission from Judges Politz and Bauer and Chief Justice Rehnquist." Id. at 9. Judge McBryde has taken the position that the statute operates facially as an impermissible prior restraint because it provides that all "papers, documents, and records" relating to section 372(c) proceedings "shall not be disclosed by any person ... except to the extent that ... such disclosure is authorized" by the subject judge and one of three other government officials. 28 U.S.C. § 372(c)(14); see Pl.'s Omnibus Reply to Court  Ordered Responses at 4. In other words, he maintains, the statute sets up a kind of suspect licensing scheme wherein the ability to engage in core political speech is contingent upon the permission of government officials, without offering any guidelines or standards by which those officials' discretion may be curtailed. See id. Moreover, he asserts that the statute has been applied to Judge McBryde as an unconstitutional prior restraint, preventing him from speaking freely per Chief Justice Rehnquist's ongoing interdiction against full disclosure of the record and its seemingly uncertain scope. See id. at 9-10.

3. Viewing Judge McBryde's Claim in Light of First Amendment Doctrine
Speech on public issues, particularly the conduct and performance of government officials, occupies "the highest rung of the hierarchy of First Amendment values ...." Carey v. Brown, 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1979). In Mills v. Alabama, 384 U.S. 214, 86 S.Ct. *174 1434, 16 L.Ed.2d 484, the Supreme Court announced that, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." Id. at 218, 86 S.Ct. 1434; see also New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (exhorting that "debate on public issues should be uninhibited, robust, and wideopen"). It is beyond peradventure, then, that complaints about the judicial behavior of a federal judge, a government official endowed with life tenure absent extraordinary circumstances, rest at the center of the kind of expression the First Amendment must protect. Cf. Landmark Communications, 435 U.S. at 839, 98 S.Ct. 1535; First Amendment Coalition v. Jud. Inquiry and Rev. Bd., 784 F.2d 467, 473 (3d Cir.1986) (both discussing the significance of public debate about the conduct of the judiciary in the context of reviewing state judicial misconduct hearings). Surely this protection extends not only to the complainants and other interested parties, but also to the judges themselves to marshal their own explanation or defense.
Indeed, any provision that restricts speech on the basis of its content must undergo "the most exacting scrutiny." Boos v. Barry, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). To withstand such scrutiny, the provision in question must be both "necessary to serve a compelling state interest and narrowly drawn to achieve that end." Id.; see also Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). Nonetheless, even "core" protected speech is not immune from government regulation. Early in this century, Justice Brandeis wrote:
The right to free speech, the right to teach and the right of assembly are, of course, fundamental rights. These may not be denied or abridged. But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction is required in order to protect the State from destruction or serious injury, political, economic or moral.
Whitney v. California, 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Accordingly, courts have permitted limited regulation of speech through permissible time, place, or manner restrictions, see United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), and in cases where the state interest is so weighty, and the regulation so narrowly tailored, that it prevails despite the public interest in unfettered expression.
Still, the burden such a regulation must overcome is most onerous when it constitutes a prior restraint on speech. See Smith, et al. v. Daily Mail Publishing Co., et al., 443 U.S. 97, 102, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (according prior restraints on speech "the most exacting scrutiny"). Whereas threats of subsequent penalties, whether criminal or civil damages, may well operate to "chill" speech, "a prior restraint freezes speech before the audience has the opportunity to hear the message." In the Matter of Providence Journal Co., 820 F.2d 1342, 1345-46 (1st Cir.1986). Thus, prior restraints pose an even more immediate menace than do other kinds of regulations. Justice Douglas, for example, issued the following caveat: "For if a person must pursue his judicial remedy [of lifting an injunction] before he may speak, parade, or assemble, the occasion when protest is desired or needed will have become history and any later speech, parade, or assembly will be fruitless or pointless." Walker v. City of Birmingham, 388 U.S. 307, 336, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) (Douglas, J., dissenting).
The Court is persuaded that section 372(c)(14), as it has been applied to Judge *175 McBryde, operates as a prior restraint.[23] From September 1998, when the Review Committee issued its Order and Memorandum Opinion, to June 1999, when Chief Justice Rehnquist authorized the limited disclosure of the record of the proceedings, Judge McBryde was precluded from speaking freely and openly about the process that led to his public reprimand, his recusal from certain cases, and the suspension of all new cases for one year. Judge McBryde essentially petitioned Judges Politz and Bauer for a license to disclose all aspects of the proceedings which he felt were relevant to his defense or deserving of censure. However, those two of the three government officials authorized by the Act to provide such permission declined to disclose all matters, including the identity of witnesses. Then, in June 1999, Chief Justice Rehnquist responded to Judge McBryde's entreaty by authorizing what Judge McBryde sees as a partial, and inadequate, disclosure. See McBryde Decl. of June 16, 1999 at 3-7. Thus, the current application of the confidentiality provision to Judge McBryde continues to act as a restraint on his speech, a restraint that targets particular content (the identities of the witnesses) which Judge McBryde deems essential to his defense.
Nonetheless, we recall that "[f]reedom of speech ... does not comprehend the right to speak on any subject at any time." American Communications Ass'n v. Douds, 339 U.S. 382, 394-95, 70 S.Ct. 674, 94 L.Ed. 925 (1950). For example, the Supreme Court has upheld restrictions on speech in the context of civil discovery, leaving intact a protective order that prohibited dissemination of information which one party learned about the other during pretrial discovery. See Seattle Times Company v. Rhinehart et al., 467 U.S. 20, 37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Notwithstanding Defendants' and Intervenor-Defendants' arguments to the contrary, however, Seattle Times is inapposite to the case at bar. There the Court emphasized that, "[i]n sum, judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context." Id. at 34, 104 S.Ct. 2199. Unlike such a protective order, appropriate to the "unique character of the discovery process," id. at 36, 104 S.Ct. 2199, the operative restriction on Judge McBryde's speech applies to the adversarial proceedings that ultimately engendered very public consequences. These consequences include not only a public reprimand and publicly known sanctions, but also, via the internet, the publication of the December 31 Order on the Fifth Circuit's official web site, along with the names of the 23 lawyers, and presumably witnesses, before whose cases Judge McBryde is to recuse himself. See http: //www.ca5.uscourts.gov/mcbryde/ mcbryde. htm (containing links to both the December 31 Order and the September 28 Memorandum and Order). To justify the restriction at issue here, a prior restraint on Judge McBryde's speech, the state interests warranting it must be sufficiently pressing.
When examining these interests, the Court notes that all fifty states and the District of Columbia have created some body or commission with its own set of procedural rules to monitor and review judicial conduct. Each and every jurisdiction provides some degree of confidentiality protection to guard the judicial disciplinary process, although these provisions vary in the duration of their application and the scope of their reach. See Bryan Keyt, Reconciling the Need for Confidentiality in Judicial Disciplinary Proceedings with the First Amendment, 7 Geo J. Legal Ethics 959, 961 & nn. 18-20 (1994) (listing each constitutional or statutory *176 provision mandating confidentiality, organized by the stage at which this protection ceases). In no jurisdiction, however, does the mandate of confidentiality continue in perpetuity. See id.
Several federal courts, including the Supreme Court, have considered these provisions in the context of state judicial disciplinary proceedings. The Landmark Court addressed the narrow question of "whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the [Virginia] Judicial Inquiry and Review Commission." Landmark Communications, 435 U.S. at 837, 98 S.Ct. 1535. Appellant, a newspaper, challenged its conviction for publishing an article that discussed proceedings before the Commission while those proceedings were pending. Assuming without deciding that judicial independence and protecting judges' reputations were legitimate and significant state interests, the Court nonetheless found that the provision ran afoul of the First Amendment.
Admittedly, the Commonwealth has an interest in protecting the good repute of its judges, like that of all other public officials. Our prior cases have firmly established, however, that injury to official reputation is an insufficient reason `for repressing speech that would otherwise be free.' The remaining interest sought to be protected, the institutional reputation of the courts, is entitled to no greater weight in the constitutional scales.
Id. at 841-42, 98 S.Ct. 1535 (quoting New York Times v. Sullivan, 376 U.S. at 272-73, 84 S.Ct. 710; also citing Garrison v. Louisiana, 379 U.S. 64, 67, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). Accordingly, the Court held that criminal prosecution of a third party who publishes truthful information regarding such proceedings was impermissible under the First Amendment. Id. at 845-46, 98 S.Ct. 1535.
Following that case, Virginia amended the relevant portion of the statute to apply only to participants in Commission proceedings. See Baugh et al. v. Judicial Inquiry & Rev. Com'n, 907 F.2d 440, 443 (4th Cir.1990). In a later case, attorneys who had filed complaints about state judges with the Commission challenged the constitutionality of the remaining confidentiality provision. See id. The Fourth Circuit found that the portion applying to complainants who wished to disclose the fact and outcome of their complaints deserved the most exacting scrutiny. Id. at 444 (citing Boos, 485 U.S. at 321, 108 S.Ct. 1157.). It thus reversed the district court's dismissal of the challenge, which was predicated on a more lenient standard of review. Cf. Kamasinski, 44 F.3d at 110-11 (upholding the confidentiality provisions of a Connecticut statute that maintained the confidentiality of judicial discipline proceedings unless the Judicial Review Council found probable cause to determine that judicial misconduct had occurred); First Amendment Coalition, 784 F.2d at 468 (upholding the constitutionality of a similar Pennsylvania statute permitting public access to the records of its judicial review board only if the board recommends imposing discipline, but holding the board's order banning witnesses from disclosing their own testimony overbroad). The Court emphasizes that in none of these cases did the challenged statute require confidentiality once the proceedings had reached their conclusion and the subject judge had been censured. In fact, the Kamasinski court noted specifically that "[o]nce the JRC [Judicial Review Council] has determined whether or not there is probable cause that judicial misconduct has occurred, even Connecticut's most compelling interests cannot justify a ban on the public disclosure of allegations of judicial misconduct." Id. at 112.
In a somewhat analogous context, the Supreme Court held unconstitutional a *177 Florida statute prohibiting a grand jury witness from revealing the substance of his or her testimony, even after the proceedings had concluded. See Butterworth v. Smith, 494 U.S. 624, 626, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990) (Rehnquist, C.J.). Asserting that the state interests in preserving grand jury secrecy did not "warrant a permanent ban on the disclosure by a witness of his own testimony once a grand jury has been discharged ...," the Court reasoned that these interests (e.g., the need to keep information from the target of the investigation, the need to prevent the importuning of grand jurors) became obviated once the grand jury adjourned. Id. at 632-33, 110 S.Ct. 1376.
A certain irony characterizes Judge McBryde's First Amendment claim before this Court. In every other case known to this Court involving judicial disciplinary proceedings, challenges to the confidentiality provision have issued from a complainant, witness, or third party. That person's right to speak about the proceedings had to be balanced against the state's legitimate interest in protecting the judge and the judiciary as an institution. Here, however, the subject judge himself maintains that to vindicate his reputation, he must be permitted to speak openly about the very proceedings that impugned him. Such a case would seem unusual, to say the least, possibly contemplated neither by individual courts nor by any legislature. Still, upon review of Judge McBryde's claim, this Court cannot disregard or diminish a judge's interest in vindicating his reputation, and in announcing his perspective on the proceedings to all who will listen. Indeed, this interest surely deserves the most heightened First Amendment protection.
Moreover, while the confidentiality provision in the Act and its state counterparts serves a variety of legitimate state interests  protecting the judge from spurious criticism, the judiciary as an institution from disrepute, and witnesses and complainants from unwanted publicity  the paramount interest is that of the subject judge.[24] Publication of frivolous and unfounded complaints threatens to impugn, and even destroy, a judge's reputation even when an investigation ultimately acquits him or her. According to Judge McBryde, the Defendants' silence in their November 23, 1998 letter to the Chief Justice on the issue of protecting witnesses' identities from disclosure is "tantamount to an admission by defendants that there is no compelling state interest for denial of disclosure of the identities of the witnesses in the proceedings." Pl.'s Omnibus Reply to Opp. to Mot. Unseal at 22. The Court does not go so far as to endorse this view, but rather understands the Chief Justice, citing the Fifth Circuit Rules, to have articulated a legitimate concern for witness privacy and the necessity of encouraging witnesses to come forward with complaints in other instances. In his response to Judge McBryde, the Chief Justice was acting strictly in an administrative capacity, carrying out the function delineated by the statute; he was neither reviewing nor issuing a ruling on the constitutionality of the provision. Nonetheless, the Court finds that, at the point where the proceedings have long since concluded and Judge McBryde has undergone a public reprimand and sanctions, *178 this interest loses much of its significance. In addition, as Judge McBryde points out, the names of many of the witnesses have already reached the public domain, through the internet or through newspaper accounts of the proceedings. Other witnesses are easily identified through contextual information which Judge McBryde is permitted to disclose, in accordance with the Court's narrow interpretation of the Chief Justice's letter. At this stage, the interest of protecting witnesses' names cannot possibly justify the imposition of a prior restraint on Judge McBryde's ability to discuss and to challenge publicly the proceedings that resulted in his censure.
In sum, the Court finds that section 372(c)(14), as it has been applied to Judge McBryde, operates as an unconstitutional prior restraint on his ability to speak. The interest in shielding witnesses from publicity and encouraging complainants to come forward in the future, while legitimate, is insufficient to justify the restriction on Judge McBryde's open and frank discussion of the proceedings once they have concluded and sanctions have been imposed.

III. CONCLUSION
For the reasons stated above, judgment shall be entered for Defendants and the United States on all claims save Judge McBryde's First Amendment claim. The Court shall enter judgment for Judge McBryde on his claim that the confidentiality clause, as it has been applied to him, violates the First Amendment.
An order accompanies this memorandum opinion.

 INDEX
 I. BACKGROUND ................................................................ 140
 A. The Statutory Scheme ................................................... 141
 B. The Special Committee's Investigation and Report ....................... 141
 C. Action by the Judicial Council and the Review Committee ................ 147
 D. Proceedings in this Court .............................................. 149
 II. DISCUSSION ................................................................ 151
 A. Judge McBryde's Claim that the Act is Facially Unconstitutional ........ 151
 1. Whether the Act Endows the Judicial Branch with Powers More
 Appropriately Exercised by Other Branches (Count I) ................. 152
 2. Whether the Act Threatens the Institutional Integrity of the
 Judicial Branch (Count III) ......................................... 153
 3. Whether the Act Allows Improper Exercise of Article III Power
 (Count II) .......................................................... 156
 B. Potential Limits on this Court's Jurisdiction .......................... 157
 1. Expanded Scope of the Investigation ................................. 159
 2. "Merits-Relatedness" ................................................ 160
 3. The Non-Constitutional Claims ....................................... 164
 C. As-Applied Constitutional Claims ....................................... 164
 1. Separation of Powers ................................................ 164
 2. Due Process ......................................................... 165
 D. Judge McBryde's First Amendment Claim .................................. 171
 1. Events Relating to this Claim ....................................... 171
 2. Judge McBryde's Argument ............................................ 173
 3. Viewing Judge McBryde's Claim in Light of First Amendment
 Doctrine ............................................................ 173
III. CONCLUSION ................................................................ 178

ORDER
For the reasons expressed in the accompanying Memorandum Opinion it is, this 30 day of December, 1999, hereby
ORDERED that Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [# 45] is GRANTED as to all of Judge McBryde's claims with the *179 exception of his First Amendment claim; and it is further
ORDERED that Intervenor-Defendant's Motion to Dismiss [# 50] is GRANTED as to all of Judge McBryde's claims with the exception of his First Amendment claim; and it is further
ORDERED that Plaintiff Judge McBryde's Motion for Summary Judgment [# 51] is DENIED as to all claims, EXCEPT that the Motion is GRANTED for Plaintiff as to his claim that the Act has been applied to him in a manner that violates the First Amendment; and it is further
ORDERED that entry of judgment on Plaintiff's First Amendment claim is STAYED until January 7, 2000, so that defendants, should they wish to do so, may seek an additional stay from the United States Court of Appeals pending any appeal; that all sealing orders shall remain in effect during this period of the stay.
SO ORDERED.
NOTES
[1] An Index can be found at the end of this Memorandum Opinion.
[2] In an effort to comply with the confidentiality clause, the Court shall refrain from naming any of the witnesses who testified before the Special Committee.
[3] Judge McBryde has raised numerous objections to this § 332 hearing, none of which is properly before the Court in this challenge to the constitutionality of § 372(c).
[4] Two of the complaints against Judge McBryde pertained to the Satz and Torres matters. After the Fifth Circuit vacated Chief Judge Buchmeyer's order, the Special Committee "determined not to hear evidence in [the § 372(c)] proceeding concerning the sufficiency of the record that was before Judge McBryde in Satz and Torres." Report at 8.
[5] In lieu of prevailing upon Judge McBryde to undergo a full psychiatric examination, the Special Committee ultimately retained a psychiatrist who attended the evidentiary hearings, listened to witness testimony, and observed Judge McBryde's demeanor. At the conclusion of the hearing, the psychiatrist submitted a report summarizing his observations and offering his clinical impressions, without actually advancing a diagnosis. The Special Committee appended the psychiatrist's correspondence as an attachment to its Report. See id. ¶¶ 81, 131; Report, Attachment A.
[6] The Special Committee organized its Report around twenty discrete scenarios exemplifying Judge McBryde's intemperate and abusive behavior, one of which encompasses several incidents. See Report, Table of Contents. In addition, the Report related in more summary terms other examples evidencing Judge McBryde's conduct, and its impact on the legal community.
[7] Elsewhere the Special Committee described "a disturbing pattern on Judge McBryde's part of making devastating allegations of deceit and bad faith against attorneys who disagree with him." Id. at 35.
[8] On appeal, the Fifth Circuit held that the district court had abused its discretion in sealing the final order and transcript, reversing and remanding the case to Judge McBryde. See S.E.C. v. Van Waeyenberghe, 990 F.2d 845, 847 (5th Cir.1993). The court also found that the counsel opposing the sealing order was not in fact acting in bad faith. See id. at 849 n. 5. The Court of Appeals did not, however, comment on Judge McBryde's behavior toward the attorney, but instead merely asserted that Judge McBryde's accusation of bad faith was incorrect.
[9] The sanctions which Judge McBryde imposed upon the government attorneys in this case also reached the Fifth Circuit on appeal. See Dawson v. United States, 68 F.3d 886 (5th Cir.1995). Ultimately, the court of appeals vacated the order imposing sanctions, and reversed the findings of bad faith against government counsel. See id. at 898-99. In a footnote regarding the government's summary judgment motion and the Texas statute upon which the government relied, but had failed to raise at an earlier stage in the proceedings (i.e., as an affirmative defense), the Dawson court declined to address the district court's conduct directly. Instead, the court of appeals included a suggestive remark responding to portions of Judge McBryde's order quoted earlier in the opinion: "Equally, whether this failure, or counsels' raising the Texas statute by other means, merited the court's scathing rebuke, as quoted infra, is another matter upon which we will not comment." Id. at 891 n. 5.
[10] Judge McBryde testified before the Special Committee as follows: "I didn't know whether he was there for the purpose of creating a confrontation of some kind. I simply did not know what he was there for. I was told he was there with a court reporter. I assumed that it was to engage in some kind of inappropriate activity on his part ...." Id. at 64. His peers on the District Court fared no better with Judge McBryde. The Special Committee listened to several incidents in which Judge McBryde reacted with rancor and insult to his fellow district court judges. See id. at 103-07.
[11] In its Order, the Review Committee recounted the history of the Section 372 proceedings involving Judge McBryde, and then proceeded to determine what standard of review it should apply to the Judicial Council's findings of fact (i.e., those the Council adopted from the Special Committee's Report) and judgment with respect to the appropriate sanctions under these circumstances. Review Committee Order at 2-4. After a detailed discussion of the matter, the Review Committee deemed that it should apply an intermediate standard of "substantial deference" to both the factual findings and the Judicial Council's remedies. See id. at 4-7. In particular, the Review Committee considered Judge McBryde's challenge to the Special Committee's expansion of the investigation, id. at 7-10, his allegation that he received inadequate notice of the expansion of the investigation, id. at 10-11, and what the Review Committee labels "other procedural issues" raised by Judge McBryde, id. at 11-13. Ultimately, the Review Committee concluded that, under either a clear-and-convincing evidentiary standard or a preponderance-of-the-evidence standard, "the evidence adduced regarding Judge McBryde's patterns of conduct is more than sufficient to support the judicial council's findings." Id. at 19.
[12] The parties are in agreement that the finality clause does not bar review of Judge McBryde's facial constitutional claims.
[13] On appeal, the bulk of Judge Gesell's decision was vacated on ripeness grounds, whereby the appellate court never reached its merits. Notwithstanding its lack of precedential authority, the Court shall occasionally cite to this opinion for its persuasive reasoning and thoughtful analysis of the merits of this issue.
[14] This is not to suggest that the such a scheme is without the potential for abuse. As Judge McBryde forcefully contends, the Act could be used as a means of hazing judges whose views do not comport with those held by their colleagues. A full-blown investigation undoubtedly takes its toll on a subject judge in terms of time, money, and potential damage to reputation. Judge McBryde's claim that the Defendants have used the Act to undermine his independence will be analyzed in the context of his as-applied claims. For now, the Court simply notes that the mere potential for abuse does not render the Act facially invalid where its legitimate uses remain within constitutional bounds and it places no undue burden on judicial independence. See Hastings II, 783 F.2d at 1508 (balancing the personal pressures placed on a subject judge against institutional values of judicial independence).
[15] Complaint Rule 9(A) is not to the contrary: it also permits the special committee to expand the scope of its investigation "[i]f the committee concludes that the judge may have engaged in misconduct beyond the scope of the complaint." See 5th Cir. Compl. R. 9(A) (Pl.'s Ex. 143).
[16] A pattern of conduct such as Judge McBryde has demonstrated raises profound concerns regarding not only the Fort Worth legal community, but also the American legal profession more generally. The question of civility and its regrettable decline among members of this profession has emerged as a major topic of concern among lawyers, judges, and legal scholars. See, e.g., Symposium, One Response to the Decline of Civility in the Legal Profession: Teaching Professionalism in Legal Research and Writing, 51 Rutgers L.Rev. 889 (1999); Hon. Alva Hugh Maddox, Lawyers: The Aritstocracy of Democracy or "Skunks, Snakes, and Sharks"? 29 Cumb. L.Rev. 323 (1998-99); Hon. Marvin E. Aspen, The Judiciary  New Issues and New Visions: Promoting Civility in Litigation, 40 Fed. B. News & J. 496 (1993); ABA Comm. on Professionalism, "In the Spirit of Public Service": A Blueprint for the Rekindling of Lawyer Professionalism, 112 F.R.D. 243 (1986). Many of these commentators have lamented the apparent lack of civility in the world of politics, and have noted the same trend in that of law. As Justice Anthony Kennedy reminded us, "[c]ivility has deep roots in the idea of respect for the individual ... respect [for] one another's human aspirations and equal standing in a democratic society." Justice Anthony M. Kennedy, Address to 1997 ABA Ann. Meeting (Summer, 1997, San Francisco, CA).

If incivility among lawyers threatens to bring the entire legal profession into disrepute, then a lack of civility in the judiciary promises to undermine profoundly American society's respect for the rule of law and its faith in the possibility of achieving just results. Chief Justice Warren Berger admonished his judicial colleagues almost thirty years ago: "Every judge must remember that no matter what the provocation, the judicial response must be judicious response and that no one more surely sets the tone and the pattern for courtroom conduct than the presider." Warren E. Burger, The Necessity for Civility, 52 F.R.D. 211, 215 (1971) (Text of speech delivered at the Opening Session, American Law Institute, May 18, 1971, Wash. D.C.). Judges occupy a unique, and uniquely powerful, role in American society; thus, when they behave toward attorneys (or litigants) in an intemperate, contemptuous, and arbitrary manner, the consequences extend beyond the immediate target of their actions. As Judge Louis Pollak, former law school dean and American Bar Association section chair, wrote: "when the target of a judge's unjustified polemic is a lawyer practicing in the judge's court  the harm to civility may be even more serious. This for the reason that the judge, speaking from a privileged sanctuary, is acting the bully and dishonoring the robe." Hon. Louis H. Pollak, Professional Attitude, A.B.A. J., Aug. 1998, at 66, 67. Indeed, the Act recognizes that a judge's conduct, if gratuitously abusive, is likely to exercise a pernicious influence upon the morale and efficacy of the legal profession and the administration of justice.
[17] The Court notes that all of these arguments were considered and found to be without merit by the Review Committee.
[18] Some jurists have expressed concern that suspension might become equivalent to removal if it extended for an inordinate amount of time, see e.g., Hastings I, 770 F.2d at 1108-09 (Edwards, J., concurring) (using fifteen years as the benchmark), but a one-year suspension does not implicate these concerns.
[19] As a result of this order, thirty-three of the cases on Judge McBryde's docket were reassigned to other judges.
[20] Rule 9(A) of the Rules Governing Complaints of Judicial Misconduct or Disability provides in full:

Each special committee will determine the extent of the investigation and the methods to be used. It the committee concludes that the judge may have engaged in misconduct beyond the scope of the complaint, it may expand that scope to encompass such misconduct, timely providing written notice of the expanded scope to the subject judge.
5th Cir. Compl. R. 9(A) (Pl.'s Ex. 143).
[21] Although both Defendant and Defendant-Intervenor understood Judge McBryde to be advancing a facial due process claim, alleging that the Act itself impermissibly sanctions a combination of investigative and adjudicative functions in members of the Judicial Council who also participated in the Special Committee's investigation, see United States Mem. Opp. Pl.'s Mot. Summ. J. at 9; Def.'s Mem. Supp. Mot. Dismiss or for Summ. J. at 41-42, Judge McBryde characterizes his claims otherwise. See Pl.'s Omnibus Reply to Opp. Mot. Summ. J. a 35. ("As Judge McBryde has previously explained, his due process claims are not a facial attack on the Act, but a complaint that the proceedings carried out against him denied him due process.") Rather, his claim targets another as-applied violation, in this case the improper overlap of these functions contrary to the intent of the Act. See Compl. ¶ 92c; Pl.'s Response to United States' Mot. Dismiss at 14 ("Indeed, it is [Judge McBryde's] position that the Act does not combine investigative and adjudicative functions. It intends that they be separate.")
[22] Specifically, he argues that "[t]his unbridled discretion  which here was exercised on the basis of content  that § 372(c)(14) grants to the Chief Justice is precisely what makes the provision unconstitutional on its face." Id. at 8-9.
[23] Because the Court finds that the confidentiality provision has functioned as an unconstitutional prior restraint in its application to Judge McBrdye, it need not reach the issue of whether or not section 372(c)(14) itself is facially unconstitutional.
[24] In its report recommending passage of the Act, the Senate Judiciary Committee identified the principal interests served by the confidentiality provision: "The Committee believes that the establishment of a confidentiality provision will avoid possible premature injury to the reputation of a judge." 1980 U.S.C.C.A.N. 4215, 4330. Indeed in the version of the statute under consideration by the Committee, the confidentiality provision articulated three exceptions to its application: (1) an authorized written waiver by the subject judge; (2) issuance of a public censure or reprimand; or (3) a final adverse action taken against the judge, not including an order of dismissal. See id. Each of these exceptions presumes one thing: that the primary interest at stake resides in the reputation of the judge. In the first exception, this interest has been waived; in the second and third, the interest is obviated by the results of the proceedings.